EXHIBIT "C"

KENNER LAW FIRM, P.C.
David E. Kenner, SBN 41425
Brett A. Greenfield, SBN 217343
16000 Ventura Boulevard, PH 1208
Encino, CA 91364
818 995 1195
818 475 5369 - fax

WADE, KELLY & SULLIVAN
733 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
(907) 561-7743
(907) 562-8977 - fax

Attorney for Defendant Josef F. Boehm

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| Sally C. Purser, | ) |
| | ) DEFENDANT JOSEF BOEHM'S |
| Plaintiff, | ) SUPPLEMENTAL MEMORANDUM OF POINTS |
| | ) AND AUTHORITIES IN SUPPORT OF |
| v. | ) OPPOSITION TO PLAINTIFF'S SECOND |
| | ) MOTION FOR SUMMARY JUDGMENT |
| Josef F. Boehm, Allen K. | ) |
| Bolling, and Bambi Tyree, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| _____ | ) |
| | ) |

CASE NO.: A05-0085 (JKS)

## I.   ADDITIONAL EVIDENCE AND ARGUMENT

Boehm brings this supplemental brief laying out additional evidence and contradictions in which to show disputable issues of material fact and inferences to be drawn from the statements made by Purser and Tyree in support of summary judgment.

Boehm respectfully submits the following additional evidence to be considered:

1

### 1. Recorded transcript of Miranda Ditullio

Ms. Ditullio submitted to a interview with Boehm's investigator Terry Shirtleff, *incorporated herein as Exhibit "A"*. Ms. Ditullio's statements were recorded in the presence of her parents and with her consent. Her statements contradict Purser's allegations and lend further support to the evidence presented in Boehm's initial opposition.

### 2. Sworn Testimony of Dr. Jacobsen

In response to Plaintiff's assertion that Dr. Jacobsen's report is not sworn testimony, Boehm's submits Dr. Jacobsen's sworn testimony confirming the contents of his report, relevant parts *incorporated herein as Exhibit "B"*.

### 3. Declaration of Josef Boehm

In response to Plaintiff's assertion that Boehm's responses to discovery are not sworn under penalty of perjury, Boehm submits a declaration specifically denying each of the allegations set forth in the Affidavit of Purser and Tyree, *incorporated herein as Exhibit "C"*.

### 4. Declaration of Terry Shurtleff

Mr. Shurtleff's declaration under penalty of perjury sets forth the circumstances under which his interviews were knowingly recorded, accurately recorded and accurately transcribed, *incorporated herein as Exhibit "D"*.

### 5. Plaintiff's Expert Dr. Rose, Psychological Evaluation of Pursar.

Boehm submits Dr. Rose's report to bring out her inconsistent statements and lack of candor when being interviewed by her own expert. In addition, Dr. Rose's report is very telling when describing

2

1  Purser's psychological state and character type, incorporated herein
2  as Exhibit "E"

3      **6. Sally Purser Deposition Testimony**

4      Additional comparisons of purser's deposition testimony to
5  statements given to her own expert dr. Rose reveal significant
6  discrepancies and contradiction leading to a conclusion that inference
7  must be drawn from present statements and genuine issues of material
8  fact, relevant portions incorporated herein as Exhibit "F"

9
10 **II.  WITNESS MIRANDA DITULLIO RECORDED INTERVIEW WITH INVESTIGATOR
    TERRY SHURTLEFF**

11
12     Miranda Ditullio submitted to a recorded interview at Chili's
13 restaurant in Anchorage Alaska on June 1, 2004. Ms. Ditullio was
14 present with her mother and step father James Matthews and Loanna
15 Ditullio. They were aware that they were being recorded and were made
16 aware that Terry Shirtleff was the investigator for Josef Boehm.

17     Ms. Ditullio testified that she had not been offered nor accepted
18 money for her statements. *Ditullio Interview, Page 19.* A transcribers
19 certificate is signed by Dana J. Kelly, CET. *Ditullio Interview, Page
20 20.*

21     Ms. Ditullio's testimony further confirms the subject matter set
22 forth in the declarations of Vince Blomfield and Tina Arndt. In
23 addition, Ms. Ditullio details Purser and Tyree's scam to keep Boehm
24 high on "dirty crack" cocain and steal from him. Ms. Ditullio denied
25 that Boehm provided drugs to Purser and details Tyree's blackmail of
26 Boehm.

27

28                                    3

───────────────────────────────────────────────

1    Ms. Ditullio's interview casts considerable doubt on the
2    allegations set forth by Purser and Tyree, solidifies disputable facts
3    and inferences to be drawn from Purser and Tyree's affidavits and
4    further exposes Purser's motive to collect undeserved money from Boehm
5    as follows:

6    **i. Relationship with Tyree and Introduction to Boehm**

7    Ms. Ditullio engaged in sex with Bambi Tyree when she was 16
8    years old. *Ditullio Interview, Page 3*

9    Ditullio met Boehm through Tyree and initially told Boehm she was
10    18 years old at the direction of Tyree. Upon learning she was 16 years
11    old, Boehm attempted to kick her out of his residence. Ditullio
12    continued to go back to Boehm's house with Tyree and at her direction
13    and without Boehm's consent. *Ditullio Interview, Page 3-4.*

14    **ii Tyree Supplied the Drugs**

15    Tyree supplied Ditullio with drugs. Boehm never supplied her
16    drugs and never offered drugs for sex. *Ditullio Interview, Page 3.*

17    Ditullio states that Boehm never provided drugs to anyone and
18    further contends that Bambi Tyree and Leslie Williams provided all of
19    the girls drugs. *Ditullio Interview, Page 6.*

20    **iii Tyree Controlled the Girls**

21    Boehm refused to let any underage girls around him. Even with
22    women over 18 years old, Boehm was unable to perform sexually with
23    them. *Ditullio Interview, Page 12.*

24    Ditullio identifies Tyree as controlling girls with drugs and
25    forcing oral sex on her. *Ditullio Interview, Page 10.* She again
26    identifies Tyree and Williams supplying drugs to young girls and using
27    them as props for their scam. *Ditullio Interview, Page 13.*

28

4

1    Ditullio states that Al Bolling was pimping all of the young
2    girls. She also believes that Purser became pregnant with Bolling's
3    child. *Ditullio Interview, Page 7.*

**iiii Scam to Keep Boehm High and Steal from Him**

5    Ditullio States that Tyree and Williams were poisoning Boehm's
6    drugs with something that would put him to sleep. *Ditullio Interview,*
7    *Page 13-14.* Boehm would go out almost immediately. *Ditullio Interview,*
8    *Page 14.*

9    Sally Purser would go to Boehm's house to steal money from him.
10   Purser stole $4,800.00 worth of travelers checks. Purser came to the
11   house with Erin Axt. Boehm checked her identification and kicked her
12   out. *Ditullio Interview, Page 5.*

13   Ditullio states that Boehm was being robbed and that everyone was
14   out to hustle him. Tyree would never let anyone get near Boehm.
15   *Ditullio Interview, Page 8.*

16   Ditullio Witnessed Tyree, Bolling and Williams black mail Boehm
17   by threatening to tell the authorities that he had sex with minor Erin
18   Axt. Boehm refused to pay.

19   Purser and others came to Boehm's house to steal drugs from him.
20   Boehm never provided any drugs to Tyree, Purser or their female
21   cohorts. *Ditullio Interview, Page 8.*

22   **III. PLAINTIFF'S EXPERT DR ROSE REVEALS ADDITIONAL CONTRADICTIONS OF**
23   **PURSER AND IDENTIFIES CHARACTER TRAITS CONSISTENT WITH PURSER'S**
     **PAST AND PRESENT ACTIONS**

24
25   Plaintiff's Expert Dr. Rose conducted a psychological evaluation
     of Plaintiff and prepared a report based on his findings.
26

27

28                                      5

1      Many of the events of Purser's life were withheld from Dr. Rose

2   thus invalidating his findings as they relate to Plaintiff's true

3   measure of damages and Boehm's alleged conduct.

4      Missing from Dr. Rose's report are the myriad of individuals for

5   whom Purser:

6      1. smoked "crack" cocain with;

7      2. obtained "crack" cocain from,

8      3. traded sex for money and/or drugs,  as well as

9      4. a detailed account of her involvement in several scams to

10     defraud men of their money and property with co-conspirator

11     Bambi Tyree.

12        **A. PURSER'S FACTUAL CONTRADICTIONS**

13     Dr. Rose did note a number of findings which Purser omitted from

14   her deposition testimony:

15           **Purser's uncle sexually abused her, made her go
             topless, took nude pictures of her and attempted**
16           **to massage her on several occasions.** *Dr. Rose*
             *Report, page 2*
17

18     In her deposition, Purser denied any sexual misconduct by her

19   uncle and went on to deny telling this to Dr. Rose raising yet another

20   instance of Purser's flawed credibility.

21           **Q.  When you were living with your uncle in
             Washington, were you ever sexually assaulted by**
22           **him?**
             **A.   No.**
23           **Q.   Did you ever tell anybody you were?**
             **A.   Yes.**
24           **Q.   Who did you tell you were sexually assaulted
             by**
25           **your uncle in Washington?**
             **A.   My mother.**
26           **Q.   That was a lie?**
             **A.   Yeah, to my mom.**
27

28                                    6

1  *Page 34, Lines 8-17*

2          Q.  Well, do you recall having an interview with the
3          psychologist, a doctor rose?
           A.  Yeah.
4          Q.  Do you remember telling Dr. Rose that your uncle
5          physically abused you, or sexually assaulted you in
6          Washington?
           A.  My uncle never physically sexually assaulted
7          me.
           Q.  Did you ever tell that to Dr. Rose?
8          A.  Not that I recall.

9  *Page 34, Lines 24-25, Page 35, Lines 1-6*

10      Purser testifies to whatever benefits her most at the moment.

11  Purser's statements and testimony are not credible or believable.

12      In her complaint Purser accuses Boehm of getting her addicted to

13  drugs. Her statements to Dr. Rose are markedly different:

14          **Purser admits to becoming addicted to cocain
            after a three month relationship with her**
15          **boyfriend. When she took her first crack hit she
            had an "outer space feeling" and felt like "I**
16          **could not get enough".** *Dr. Rose Report, page 5*

17

18      Purser has repeatedly alleged that Boehm got her addicted to

19  "crack". Boehm has repeatedly denied this contention. Purser's

20  statements to Dr. Rose indicate an immediate need for "crack" cocain

21  after her first experience. Purser also indicates an addiction as a

22  result of a break up with her boyfriend.

23      In her deposition, Purser testified to living with boyfriend Jay

24  Whaley while she was 16 years old. Purser went on to testify that he

25  provided her "crack" cocain and was a known drug dealer and escort

26  service operator.

27

28                              7

1  Purser has no evidence in which to suggest Boehm provided her

2  drugs or that Boehm got her addicted to drugs other than her own self

3  serving affidavit.

4  **B. PURSER'S CHARACTER TRAITS**

5  Dr. Rose goes on to assess Purser's character traits, validity

6  of complaints and personality type associated with her testing

7  results.

8  "...**She is experiencing significant psychological**
   **problems, although she may be exaggerating her**
9  **complaints**...". *Dr. Rose Report, page 8*

10

11  In describing the characteristics associated with Purser's

   clinical profile, Dr. Rose opines as follows on *page 8 of his report*:
12
   1. They tend to manipulate others for their own gratification;
13
   2. They rationalize their difficulties and blame others for their
14
   problems;
15
   3. They behave in a somewhat aloof, cold and callous and
16
   uncompromising manner often attempting to advance themselves at the
17
   expense of others;
18
   4. They are addiction prone to drugs and alcohol.
19
   Purser's present and past actions are explained perfectly by the
20
   vary character traits associated with her profile as determined by her
21
   own expert!
22

23
   **IV.  DR. JACOBSEN GAVE SWORN TESTIMONY CONFIRMING THE FINDINGS IN HIS**
24  **REPORT**

25  Plaintiff argues that Dr. Jacobsen's report should not be
26
   considered because it is not given under penalty of perjury. Dr.
27

28  8

1   Jacobsen confirmed the contents of his report in sworn testimony on

2   May 5, 2005.

3       Dr. Jacobsen testified to Spending at least 17 hours evaluating

4   Boehm in order to draft report and findings. Page 87, line 8-16

5       Dr. Jacobsen refers to Tyree's sworn testimony:

6           **She was specific that they were each using an
            ounce or more of cocaine -- crack cocaine per day**

7           **and that they would use it in patterns of runs,
            which means continuous use without sleep, for up**

8           **to a week.** *Page 99, lines 14-25*

9

10          **But Mr. Boehm didn't give me this history,
            because I think he -- he doesn't remember very**

11          **well what was going on, it just being given to
            him, but Ms. Tyree was very, very clear that it
            was an ounce a day or so per person.** *Page 100,*

12          *lines 1-3*

13      Dr. Jacobsen identifies a conspiracy against Boehm as a

14  underlying set of facts explaining his findings:

15

16          **information is most consistent with a conspiracy
            between Ms. Tyree, Mr. Bolling and Mr. Williams**

17          **to keep Mr. Boehm supplied with crack cocaine so
            as to get money, in other words, steal from him."**

18          **"Available information is consistent with Mr.
            Boehm being among the victims of this conspiracy.**

19          **Given the amounts of patterns of crack cocaine
            used by Mr. Boehm from about 2001 to 12/03, he**

20          **would have been functioning in a survival-type
            mode where the only issue of importance would**

21          **have been to continue to use crack cocaine with
            no    consideration    of    possible    future**

22          **consequences."** *Page 113, lines 24-25, Page 114, lines 1-11*

23

24

25

26

27

28                                          9

─────────────────────────────────────────────────────────

1    **V.    PLAINTIFF'S ARGUMENTS SET FORTH IN REPLY TO OPPOSITION**

2        **i. Plea Agreement**

3        Plaintiff argues that Boehm is attempting to somehow "back pedal"

4    from the plea agreement.[1] Purser additionally argues that Boehm's

5    discovery responses are factually inconsistent with the plea

6    agreement.

7        Nowhere in the plea agreement does Boehm admit to any actions

8    directed at Purser. Boehm's discovery responses and affidavit

9    succinctly and specifically deny Purser's allegations. Purser has no

10    evidence to confirm her allegations and relies entirely on as plea

11    agreement as the basis for her findings.

12        **ii. Purser's Past Statements**

13        Purser's counsel suggests that plaintiff's recorded statements

14    contradicting her present statements should be ignored.

15        Sally Purser acknowledged her past statements in her deposition

16    and stated that her feelings have changed. Certainly her credibility

17    should be allowed to be tested as a jury would be allowed to hear past

18    contradictory statements.

19        **iii. Criminal Records and Drug Use By All**

20        Finally, Purser argues that Tina Arndt's declaration should be

21    ignored because of a criminal record. Purser need look no further than

22    herself, Tyree and every single witness to this action. This is a case

23    where everyone smoked "crack" cocain. Their perceptions are flawed and

24

25    _____
     [1]Counsel is not attempting to use summary judgment in which to challenge the plea
26    agreement. Counsel is well aware that a 18 U.S.C. § 2255 Motion is available but has not yet
     determined whether, when or how to pursue that issue, however, that issue is supported by
27    compelling additional facts which recognize that there are clearly material issues of disputable
     fact.
28                                    10

     _____
     SUPPLEMENTAL OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR SUMMARY
                                    JUDGMENT

1  memories diminished. Their understanding of consequences and ability
2  to make sound judgment are non-existent. That alone creates inferences
3  to be drawn from everyone's statements and triable issues of material
4  fact.

5  **VI.    CONCLUSION**

6      For the foregoing reasons, Defendant Boehm respectfully moves
7  this honorable Court to deny summary judgment in its entirety.

8

9  January 16, 2007                    KENNER LAW FIRM, P.C.

10

11                                  By:_____/S/_____

12                                      David B. Kenner,

13                                      Attorney for Defendant Josef F. Boehm

14

15

16                                  By:_____/S/_____
                                        Brett A. Greenfield,
17                                      Attorney for Defendant Josef F. Boehm

18

19

20

21

22

23

24

25

26

27

28                                         11

1 KENNER LAW FIRM, P.C.
David E. Kenner, SBN 41425
2 Brett A. Greenfield, SBN 217343
16000 Ventura Boulevard, PH 1208
3 Encino, CA 91364
818 995 1195
4 818 475 5369 - fax

5 WADE, KELLY & SULLIVAN
733 W. 4th Avenue, Suite 200
6 Anchorage, Alaska 99501
(907) 561-7743
7 (907) 562-8977 - fax

8 Attorney for Defendant Josef F. Boehm

9          IN THE UNITED STATES DISTRICT COURT

10              DISTRICT OF ALASKA

11

12 Sally C. Purser,                    )
                                       )  DECLARATION OF BRETT A.
13          Plaintiff,                 )  GREENFIELD RE SUPPLEMENTAL
                                       )  OPPOSITION TO PLAINTIFF'S SECOND
14          v.                         )  MOTION FOR SUMMARY JUDGMENT
                                       )
15 Josef F. Boehm, Allen K.            )
Bolling, and Bambi Tyree,             )
16                                     )
                                       )
17          Defendants.                )
                                       )
18 _____            )
                                       )
19                                     )  CASE NO.: A05-0085 (JKS)

20      I, Brett A. Greenfield, declare as follows:

21 1.   I am an attorney duly licenced to practice law in the State of

22 California and before this Honorable Court.

23 2.   The following true and correct copies of documents have been

24 marked and attached hereto as Exhibits to the Supplemental Opposition

25 to Plaintiff's Second Motion for Summary Judgment:

26      Exhibit  "A",  Recorded  Transcript  of  Miranda  Ditullio  by

27 Investigator Terry Shurtleff;

28

                              1

            DECLARATION OF BRETT A. GREENFIELD

1    Exhibit "B", Relevant Pages of the Sworn Sentencing Hearing
2  Testimony of Dr. Jacobsen;

3    Exhibit "C", Declaration of Josef Boehm;

4    Exhibit "D", Declaration of Terry Shurtleff;

5    Exhibit "E", Psychological Evaluation and Report of Dr. Rose;

6

7    Exhibit "F", Sally Purser Deposition Testimony, Relevant Pages.

8    I declare the foregoing to be true and correct under the penalty
9  of perjury.    Executed this 16th of January, 2007 at Encino,
10 California.

11

12    Brett A. Greenfield

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

DECLARATION OF BRETT A. GREENFIELD

**EXHIBIT "A"**

TRANSCRIPT OF RECORDED
INTERVIEW OF MIRANDA DiTULLIO

June 1, 2004

TRANSCRIPTS ONLY

1943 Hillcrest Drive

Anchorage, Alaska 99517

(907) 276-0306

283398e9-36df-4053-8c90-30e120a7e3b1

RECORDED INTERVIEW OF MIRANDA DiTULLIO
JUNE 1, 2004

**Page 2**

```
1              JUNE 1, 2004
2      (Tape 1, Side A)
3      MR. SHIRTLEFF: So it's June 1st, 1:45 -- or 1:50 p.m., at
4   Chili's Restaurant in Dimond. This is Terry Shirtleff on record
5   with -- as Phillip Weidner's investigator, representing Joe
6   Boehm.
7              MIRANDA DiTULLIO
8   was interviewed as follows:
9   BY MR. SHIRTLEFF:
10  Q   Miranda, like I said before, my name is Terry Shirtleff.
11      I represent -- I work for Phillip Weidner, who re)-- who
12      is one of the attorneys who represents Joe Boehm. Do you
13      understand?
14  A   Yes.
15  Q   You don't have to speak to me if you don't want to. You
16      can have anybody present if you want. Just for the record
17      I'd like to state that your mother is present, as is
18      your.....
19  A   Stepfather.
20  Q   .....stepfather is present, and that's James.....
21  A   Matthews.
22  Q   .....Matthew and Louanna?
23  MS. DiTULLIO: Louanna DiTullio.
24  Q   Louanna DiTullio are also present. Do you have any
25      problem speaking to me?
```

**Page 3**

```
1   A   No.
2   Q   Okay, great. I'm gonna go off record now.
3       (Off/on record)
4   Q   Okay, this is Terry Shirtleff. I'm back on record. All
5       the same people are still present, Miranda DiTullio,
6       Louanna DiTullio and James Matthews are here. James
7       Matthews and Louanna DiTullio are Miranda's mother and
8       stepfather. Miranda, can you -- can you tell me how you
9       came to be over at Joe's house?
10  A   Through Bambi.
11  Q   Through Bambi. And why -- and -- and what was your
12      relationship with Bambi?
13  A   She was my girlfriend.
14  Q   I see. Were -- and were you physically intimate with
15      Bambi?
16  A   Yes.
17  Q   And who old were you at the time?
18  A   I was 16.
19  Q   And -- and when you -- when you went over to Joe's you
20      went up to Joe -- say -- let me about that. How --
21      what -- how did -- when you met Joe what went on?
22  A   When I first met Joe I told him I was 18, which I lied to
23      him.
24  Q   Uh-huh.
25  A   And he told me that I could no longer be over there and I
```

**Page 4**

```
1       wasn't -- and so -- but I still went there, but not to see
2       him. He wouldn't see no more, and I'd end up being there
3       for Bambi.
4   Q   So you -- what, you told him you were 18, and then -- and
5       then you told him your real age and he said you couldn't
6       be over there anymore?
7   A   Yeah.
8   Q   And did -- did he ever give you any drugs or did you -- or
9       was it basically -- or did Bambi supply the drugs?
10  A   Bambi did.
11  Q   Bambi supplied the drugs to you? And so anything that you
12      did with Joe was consensual.
13  A   Yes.
14  Q   You -- it wasn't against your will and it wasn't for drugs
15      or money?
16  A   No.
17  Q   Okay. Did he ever offer you anything in exchange for
18      anything you did for him?
19  A   No.
20  Q   You were just over there, Bambi give you some dope, and
21      you were just partying; is that.....
22  A   Yes.
23  Q   .....is that about right?
24  A   Yes.
25  Q   You -- did -- and once you told Joe how old you were,
```

**Page 5**

```
1       which was 16, right?
2   A   Yes.
3   Q   Yes? All right.
4   A   Yes.
5   Q   He said you could no longer be upstairs around him or
6       be -- be down with him because you were 16; is that right?
7   A   Yes.
8   Q   And then who else was around there and -- and what else
9       was going on that -- that you recall? Do you remember
10      Salley being there?
11  A   Yes.
12  Q   Salley and Erin?
13  A   Yes.
14  Q   What was -- what went on when they were there?
15  A   Salley would go there stealing money from him, and she
16      ended up bringing a younger girl there that Joe didn't
17      know that was really younger, and he ended up -- I --
18      ID'ing her, and he -- he kicked her -- he -- he.....
19  Q   So.....
20  A   .....he ended up kicking me out because I got into a fight
21      with her because she stole $4800 worth of traveler's
22      checks.
23  Q   Okay, and what -- and then that was Erin; is that right?
24  A   Yes.
25  Q   Erin Axt?
```

2 (Pages 2 to 5)

283398e9-36df-4053-8c90-30a120a7a3b1

RECORDED INTERVIEW OF MIRANDA DITULLIO
JUNE 1, 2004

**6**

1  A  Yeah.
2  Q  Did -- did you -- while you were there did you ever see
3     Erin or Salley perform any sexual acts with Joe?
4  A  Joe -- I didn't really see Salley -- Or, like, I seen -- I
5     seen Salley try and then end up leaving.....
6  Q  Uh-huh.
7  A  .....'cause he couldn't do anything.
8  Q  Right.
9  A  Erin, no. She was just there to be there.
10 Q  She was just there to be there. She wasn't involved in
11    any.....
12 A  No.
13 Q  .....anything? Did -- did you ever see Joe give the young
14    girls any drugs?
15 A  No.
16 Q  Never saw that.
17 A  No.
18 Q  Who would give them the drugs?
19 A  Bambi and Leslie.
20 Q  Bambi and Leslie would give them the drugs?
21 A  Yes.
22 Q  And then what would -- what would happen with the girls
23    with -- after that? Were -- were they doing any tricks or
24    turning -- were they.....
25 A  Mostly with Foul Al.

**7**

1  Q  Mostly with Foul Al? Was.....
2  A  Uh-huh.
3  Q  Now, was Al running them as an escort service or -- or was
4     he just.....
5  A  Pimping.
6  Q  .....down -- just br-- was he pimping them or was he just
7     down with them?
8  A  Just down with them.
9  Q  Okay. So.....
10 A  He was -- matter of fact, he was in-- in-- involved with a
11    girl named Salley who might have been pregnant by him.
12 Q  You mean Jamie?
13 A  Jamie.
14 Q  Jamie Millard?
15 A  Yeah. She's pregnant by him?
16 Q  I don't know. I don't know. The blond girl is who you're
17    talking about?
18 A  Yeah.
19 Q  Yeah. I don't know. That's the rumor that we heard. I
20    don't know the answer to that.
21 A  No, Salley, it was Salley that was pregnant.
22 Q  So what about Jamie Millard and all -- and do you -- do
23    you -- obviously, you remember her, the blond. Did you
24    ever see her with Joe?
25 A  No.

**8**

1  Q  No. Okay. And you -- you never saw Joe give any of the
2     girls drugs in exchange for sexual favors?
3  A  No.
4  Q  When the girls were -- do you remember the girls stealing
5     drugs from Joe?
6  A  Yes.
7  Q  Okay, what -- what other things do you remember about
8     that? I mean, what kind of things would they do to Joe?
9  A  Well, they -- they black-- Joe -- Bambi, Leslie, Al,
10    Paulando, all blackmailed him and said if he didn't -- if
11    he didn't pay them a certain amount of money, that they
12    were gonna tell them that he was with that girl Erin.
13 Q  Oh, I see. They were gonna tell who that he was with a
14    girl Erin?
15 A  Tell the State.
16 Q  The police?
17 A  Yeah.
18 Q  I see.
19    MR. MATTHEWS:  They were gonna blackmail him, then?
20 A  Yes.
21 Q  So do you know if they ever went through with that or did
22    Joe refuse to pay them?
23 A  Joe refused.
24 Q  And is that when.....
25 A  That's when they all came over there and Joe had just got

**9**

1     busted (indiscernible).
2  Q  I see. Now, the -- the things that you saw going over
3     there, I mean -- I mean, you -- you were in the life. I
4     mean, was Joe the -- he -- Joe wasn't -- did -- or did it
5     appear to you that Joe was in on any of this stuff, or was
6     he just getting robbed?
7  A  He was just getting robbed.
8  Q  Okay. So he was kind -- more of a victim than -- he was
9     just a vic., right? I mean.....
10 A  Yeah
11 Q  .....he was the vic., everybody was on the hustle to get
12    him; is that -- is that accurate or.....
13 A  Yes.
14 Q  Okay. Did you ever see -- did you ever see Tina or Ragine
15    over there?
16 A  Yes.
17 Q  Do you remember those gals? They were of age, right?
18 A  Yes.
19 Q  Right. Okay. Now, when -- when Bambi was around did she
20    really let any of the girls get near Joe?
21 A  No. Not really.
22 Q  She -- did -- did it seem like to you that Bambi wanted to
23    control -- go off record here for a minute.
24    (Off/on record)
25 Q  Okay, this is Terry Shirtleff. We're back on record. All

3 (Pages 6 to 9)

RECORDED INTERVIEW OF MIRANDA DiTULLIO
JUNE 1, 2004

| | | 10 |
|---|---|---|
| 1 | | the same people are still present, Miranda DiTullio, |
| 2 | | Louanna DiTullio and James Matthews.  Mir— or Louanna |
| 3 | | DiTullio is Miranda's mother.  James DiT— or James |
| 4 | | Matthews is Miranda's stepfather. |
| 5 | | Okay, so, Miranda, we were talking about what -- |
| 6 | | how -- how things went when Bambi was at the house.  Did |
| 7 | | she -- did -- did it seem to you that she ran the show, |
| 8 | | tried to keep in -- tried to control how Joe was getting |
| 9 | | robbed o:..... |
| 10 | A | Yes. |
| 11 | Q | How would she do that? |
| 12 | A | She would blackmail him, take his money, take his stuff, |
| 13 | | and that'd be mostly..... |
| 14 | Q | That's how she'd rob Joe.  How did she control the girls? |
| 15 | A | Well, she had them doing oral things. |
| 16 | Q | To her or.... |
| 17 | A | Yeah. |
| 18 | Q | I see.  So she -- she would control them with -- with |
| 19 | | drugs to do sexual favors..... |
| 20 | A | Uh-huh. |
| 21 | Q | ....for her, and feed them drugs; is that..... |
| 22 | A | Uh-huh. |
| 23 | Q | ....is that accurate or is that right? |
| 24 | A | That's yes. |
| 25 | Q | Okay.  And then what else did you -- what else did you |

| | | 11 |
|---|---|---|
| 1 | | see?  I mean, anything else that you can think of with |
| 2 | | regard to Leslie or Al or Bambi?  I mean.... |
| 3 | A | Leslie, I was with Leslie, end up -- me and Leslie ended |
| 4 | | up being together. |
| 5 | Q | I see. |
| 6 | A | And I was possibly pregnant by him. |
| 7 | Q | I see.  And..... |
| 8 | | MS. DiTULLIO:  Al? |
| 9 | A | Leslie. |
| 10 | Q | Was -- did that pregnancy go to term? |
| 11 | A | Yes. |
| 12 | | SERVER:  How is everything here?  Would you like a plate, |
| 13 | | ma'am? |
| 14 | A | Oh, yes, please. |
| 15 | Q | So was that -- was that pregnancy before or after you were |
| 16 | | 16? |
| 17 | A | It was before. |
| 18 | Q | Before you were 16.  So Leslie was..... |
| 19 | A | Thank you. |
| 20 | | SERVER:  You're welcome. |
| 21 | Q | Leslie was having -- was physically intimate with you..... |
| 22 | A | Yes. |
| 23 | Q | ....before you were 16? |
| 24 | A | Yes. |
| 25 | Q | What happened as a result of that preg-- did that |

| | | 12 |
|---|---|---|
| 1 | | pregnancy come -- did you have the baby or..... |
| 2 | A | Yes, I did. |
| 3 | Q | Did it end up being Leslie's, or do you know? |
| 4 | A | That's still..... |
| 5 | Q | Don't know? |
| 6 | A | Yeah.  Don't know. |
| 7 | Q | Still haven't done a -- you need to do a paternity test? |
| 8 | A | Uh-huh. |
| 9 | Q | I see.  What -- now, can you think of anything else |
| 10 | | regarding Joe or -- or what was going on over there?  You |
| 11 | | remember any of the other -- you remember the girls who |
| 12 | | came in from the Valley? |
| 13 | A | No. |
| 14 | Q | Did you ever meet them? |
| 15 | A | No. |
| 16 | Q | Okay.  But when you were there the -- the gals that |
| 17 | | were -- the -- the -- the underage gals or the young gals |
| 18 | | Joe would not let upstairs; is..... |
| 19 | A | No. |
| 20 | Q | ....that right? |
| 21 | A | No. |
| 22 | Q | And then the of age gals would go upstairs, but Joe |
| 23 | | couldn't perform, so..... |
| 24 | A | Nothing really happened. |
| 25 | Q | ....nothing -- nothing happened. |

| | | 13 |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | I see.  And Joe never gave them drugs for sexual acts? |
| 3 | A | No. |
| 4 | Q | And he never gave them money for any sexual acts. |
| 5 | A | No. |
| 6 | Q | Bambi and Al and Leslie paid..... |
| 7 | A | Yes. |
| 8 | Q | ....or gave them drugs and what have you ..... |
| 9 | A | Yes. |
| 10 | Q | ....as part of their scheme to rob Joe; does that sound |
| 11 | | right? |
| 12 | A | Yes. |
| 13 | Q | Okay.  So they were just procs, if you will.  The girls |
| 14 | | were just props in order to rob Joe; is that..... |
| 15 | A | Yes. |
| 16 | Q | Does that sound right? |
| 17 | | MR. MATTHEWS:  How -- how often did they rob this guy? |
| 18 | A | All the time. |
| 19 | | MR. MATTHEWS:  Once a day, twice a day? |
| 20 | A | Every time. |
| 21 | | MR. MATTHEWS:  Every day? |
| 22 | A | Every day. |
| 23 | Q | Every day.  Now, when you were over there did they -- did |
| 24 | | you ever see them spike his dope with heroin or anything |
| 25 | | else?  Did you ever see them spike any of his -- put |

4 (Pages 10 to 13)

RECORDED INTERVIEW OF MIRANDA DITULLIO
JUNE 1, 2004

**Page 14**

1  anything in his food or what he was drinking?
2  A  They gave -- they did -- they did his -- his -- his dope,
3  yeah. They gave him -- they put sleeping stuff in it,
4  'cause he always fell asleep after he took a hit.
5  Q  And that's pretty unusual when you're smoking crack, huh?
6  You don't go to sleep when you're smoking crack.
7  A  Huh-uh.
8  Q  And he would get -- he'd just get knocked out.
9  A  Yeah. He'd take a hit, bam. Right to sleep.
10 Q  Uh-huh.
11 A  You'd be talking to him and you look back and.....
12 Q  He'd be out.
13 A  Yeah.
14 Q  I see. Okay. So after all this went down, your contact
15 with the police, I'm interested to know did they ever
16 contact your mother or get her permission to question you?
17 A  No.
18 Q  They never did.
19 A  No.
20 Q  Did they tell you that -- did they tell -- did they tell
21 you you could have your mother present when they
22 questioned you? Do you -- do you recall that.....
23 A  No, I don't recall.
24 Q  You don't recall that?
25 A  Huh-uh.

**Page 15**

1  Q  You -- when -- when you -- when they did -- and how many
2  times did they question you before the grand jury?
3  A  Once.
4  Q  Once. Where -- did they take you to APD to do that
5  or.....
6  A  Yes.
7  Q  .....did they -- they did take you to the station to do
8  that?
9  A  Uh-huh.
10 Q  Do you remember if they videotaped it or mentioned that
11 they were videotaping it?
12 MS. DITULLIO: Mom wasn't (Indiscernible).
13 A  No, you weren't even there for grand jury.
14 MS. DITULLIO: Yes, I was. I took you there, remember?
15 A  No, the -- the first time.
16 MS. DITULLIO: Oh.
17 MR. MATTHEWS: So they -- they didn't allow you to -- to
18 call your mother or.....
19 A  No.
20 Q  They knew how.....
21 MR. MATTHEWS: .....let her know.....
22 Q  They knew how old you were?
23 MR. MATTHEWS: .....any -- any information.
24 A  Yeah.
25 Q  So they never -- did they -- did they -- did it seem to

**Page 16**

1  you that they were make -- were kind of threatening you
2  or -- or in any way kind of trying to put leverage on you
3  to say stuff that wasn't true about Joe?
4  A  No. I just remember hurrying up and getting it over with.
5  Q  Right. Did they -- when -- do you remember the room that
6  you were in? Did they put you in one of those rooms with
7  the mirror and.....
8  A  Yes.
9  Q  -- all that stuff? They did do that?
10 A  Yes.
11 Q  Do you remember if they had a tape recorder running?
12 A  Yes.
13 Q  They did? And do you recall if the -- what you've told me
14 here today is what you told them, that you told them the
15 same information?
16 A  Yes.
17 Q  There's probably no -- is there no difference in -- in
18 what you told me here today?
19 A  Well, there might be. Lot of things I forgot about.
20 Q  Okay, but the important things are -- were about Joe
21 didn't ever supply the girls with drugs; is that right?
22 A  Yes.
23 Q  And never gave them money for -- never gave them money for
24 sexual favors?
25 A  No.

**Page 17**

1  Q  Okay, the -- okay.
2  MS. DITULLIO: But did they do most of the questioning?
3  A  Yes.
4  Q  So.....
5  MR. MATTHEWS: (Indiscernible). Did they ever ask you if
6  you could have a lawyer present? Did you -- did you ask them if
7  you could have -- have your lawyer present?
8  A  They never asked me that.....
9  MR. MATTHEWS: They -- they never.....
10 A  .....and I just.....
11 MR. MATTHEWS: .....brought that up?
12 A  No.
13 Q  Do you remember if they read you your rights?
14 A  Yes.
15 Q  They did read you your rights?
16 A  No.
17 Q  And they didn't say that you could have -- you don't
18 remember them saying that your mother or your lawyer could
19 be there?
20 A  I believe that they might have said that, but I'm not
21 sure.
22 Q  But -- and you agreed to talk to them anyway or.....
23 A  Yeah.
24 Q  Okay. All right, so.....
25 MR. MATTHEWS: Don't do that again.

5 (Pages 14 to 17)

RECORDED INTERVIEW OF MIRANDA DITULLIO
JUNE 1, 2004

18

1      MS. DITULLIO: I got to get home.
2   Q  So can you think of anything else that went on there that
3      you -- can you remember?
4   A  No.
5   Q  Now, I understand that the -- the State is -- has your
6      child now; is that right?
7   A  Yes.
8   Q  have they made any threats or made any innuendos about
9      putting leverage on you to keep your child away from you
10     if you don't play ball with them?
11  A  No.
12  Q  They haven't? Okay. Have you had any more contact with
13     the police or the investigators in this case since --
14     since your testimony at the grand jury?
15  A  No.
16  Q  Okay. Have I -- okay, now, I've got some formal questions
17     to ask you. Have you been -- have I promised you anything
18     in exchange for your -- what you've told me here today?
19  A  No.
20  Q  Have I -- and you understand that I don't represent you,
21     that I work for Joe, I -- or I work for Philip Weidner
22     and he represents Joe Boehm; you understand that?
23  A  Yes.
24  Q  Do you -- and no -- no one has been promised anything as a
25     result of what you've told me here today?

19

1   A  No.
2   Q  And you -- what you've told me here today is the truth
3      as -- as you recall it?
4   A  Yes.
5   Q  Miranda, thank you very much. I'm gonna go off record.
6      (End of recording)
7   /
8   /
9   /
10  /
11  /
12  /
13  /
14  /
15  /
16  /
17  /
18  /
19  /
20  /
21  /
22  /
23  /
24  /
25  /

20

TRANSCRIBER'S CERTIFICATE

I, Dana J. Kelly, Certified Electronic Transcriber, hereby

certify:

That the foregoing pages numbered 1 through 19 are a true,

accurate and complete transcript of an interview transcribed by

me to the best of my knowledge and ability from a cassette tape

provided to me by Weidner & Associates.

DATED: June 3, 2004.

Dana J. Kelly, CET

TRANSCRIPTS ONLY
(907) 276-0306          20

6 (Pages 18 to 20)

283398e9-36df-4053-8c90-30e120a7e3b1

RECORDED INTERVIEW OF MIRANDA DiTULLIO
JUNE 1, 2004

Page 1

**— A —**
ability 20:6
about 3:26
  4:23 7:17
  7:22 8:7
  10:5 16:3
  16:19,20
  18:8
accurate 9:12
  10:23 20:5
acts 6:23 13:2
  13:4
after 6:23
  11:15 14:4
  14:14
again 17:25
  against 4:14
age 4:5 9:17
  12:22
agreed 17:22
AI 6:25 7:1,3
  8:9 11:2,8
  13:6
Alaska 3:24
allow 15:17
always 14:4
amount 8:11
Anchorage
  1:24
answer 7:20
anybody 2:16
anymore 4:6
anything 4:11
  4:17,18 6:7
  6:13 11:.
  12:9 13:24
  14:1 18:2
  18:17,24
anyway 17:22
APD 15:9
appear 9:5
around 5:5,8
  9,19
asked 17:8
asleep 14:4
Associates
  20:7
attorneys
  2:12
away 18:9
Axt 5:25

**— B —**
baby 12:1
back 3:4 9:25
  14:11
half 18:10
born 14:9
Barobi 3:10
  3:12,12,15
  4:3,9,10,11
  4:20 6:19
  6:20 8:9
  9:19,22
  10:6 11:2
  13:6
basically 4:9
before 2:10

11:15,17,18
  11:23 15:2
being 4:2 5:10
  11:4 12:5
believe 17:20
best 20:6
black 8:9
blackmail
  8:19 10:12
blackmailed
  8:10
blood 7:16,23
Boehm 2:6,12
  18:22
bringing 5:16
brought
  17:11
busted 9:1

**— C —**
call 15:18
came 3:9 8:25
  12:12
case 18:13
cassette 20:6
cause 6:7 14:4
  13:24,25
certain 8:11
CERTIFIC...
  20:1
Every 13:20
  13:21,22,23
everybody
  9:11
everything
  11:12
exchange
  4:17 8:2
  18:18

**— D —**
Dana 20:2,11
DATED 20:8
day 13:19,19
  13:21,22,23
difference
  16:1?
Dimond 2:4
Din 10:3
DiTULLIO
  1:1 2:7,23
  2:23,24 3:5
  3:6,7 10:1,2
  10:3 11:8
  13:2,12,14,16
  20:6

**— E —**
Electronic
  20:2
end 4:2 5:5
  11:3 12:3
  19:6
ended 5 16,17
  5:20 11:3
Erin 5:12,23
  5:25 6:3,9
  8:13,14
escort 7:3
even 15:13
ever 4:8,17
  6:2,12 7:24
  8:21 5:14
  9:14 12:14
  13:24,25
happen 6:22
happened
  11:25 12:24
  12:25
having 11:21
heard 7:19
her 5:18,18
  5:21 7:23
  7:24 10:16
  10:21 14:16
  15:21
heroin 13:24
Hillcrest 1:23
him 3:22,23
  4:2,4,5,18
  5:5,6,15
  7:11,15
  8:10,19
  9:12 10:12
  11:6 14:3
  14:11

**— F —**
fact 7:10
favors 8:2
control 9:23
  10:19 16:24
feed 10:21
fall 14:4
fight 5:20
first 3:22
  15:15
follows 2:8
food 14:1
foregoing
  20:4
forgot 16:10
format 11:16
Foul 6:25 7.1
from 5:15 8:5
  12:12 18:9
  20:6

**— G —**
gale 9:17
  12:16,17,19
  12:22
gave 13:3,4,8
  14:2,3
  16:23,23
getting 9:6,7
  10:8 16:4
girl 5:16 7:11

7:16 8:12
  8:14
girlfriend
  3:13
girls 6:14,22
  8:2,4,4 9:20
  10:14 12:11
  13:13 16:21
give 4:8,20
  6:13,18,20
  8:1
go 3:2 5:15
  9:23 11:10
  12:22 14:6
  19:5
going 5:9 9:2
  12:10
gonna 3:2
  8:12,13,19
  19:5
grand 13:2,13
  18:14
great 3:2
guy 13:17

**— H —**
made 18:9,8
  make 11:12
  many 15:1
  master 7:10
  Matthew 2:22
  Matthews
  2:21 3:6,7
  3:19 10:2,4
  13:17,19,21
  15:17,21,23
  17:5,9,11
  17:25
ma'am 11:13
mean 7:12 8:8
  9:3,3,4,9
  11:1,2
  meet 12:14
  mentioned
  15:10
  met 3:21,22
  might 7:11
  16:19 17:20
  Millard 7:14
  7:22
  minute 9:23
  Mir 10:2
  Miranda 3:1
  2:7,10 3:5,8
  10:1,5 19:5
  Miranda's
  3:7 10:3,4
  mirror 16:7
  Mom 15:12
  money 4:15
  5:15 8:11
  10:12 13:4
  16:23,23
  more 4:2 9:8
  18:12
  most 17:2
  mostly 6:25
  7:1 10:13
  mother 2:17
  3:7 10:3

14:16,21
  15:18 17:18
  much 19:5

**— N —**
name 2:10
  named 7:11
  near 9:20
  need 12:7
  never 6:16 8:1
  13:2,4
  14:18 15:24
  16:23,23
  17:8,9
  nothing 12:24
  12:15,25
  numbered
  20:4

**— O —**
obviously
  7:23
  off 3:2 9:23
  19:5
  after 4:17
  Office 3:3
  9:24
  often 13:17
  Oh 8:13 11:14
  15:16
  okay 3:2,4
  4:17 5:23
  7:9 8:1,7
  9:8,14,19
  9:25 10:5
  10:25 12:16
  13:13 14:14
  16:20 17:1
  17:1,24
  ONLY 1:22
  20:24
  oral 10:15
  order 13:14
  other 8:7
  12:11
  out 5:20 14:6
  14:12
  over 3:9,19,25
  4:6,20 8:25
  9:2,13
  12:10 13:23
  16:4

**— P —**
pages 20:4
  paid 13:6
  part 13:10
  partying 4:27
  paternity 12:7
  Paulande

8:10
  pay 8:11,22
  people 3:5
  10:1
  perform 6:5
  12:23
  permission
  14:16
  Phillip 2:5,21
  18:21
  physically
  3:14 11:21
  pimping 7:5,6
  plate 11:12
  play 18:10
  please 11:14
  police 8:16
  14:15 18:13
  possibly 11:6
  preg 11:25
  pregnancy
  11:10,15
  12:1
  pregnant 7:11
  7:15,21
  11:6
  present 2:16
  2:17,20,24
  3:5 10:1
  14:21 17:6
  17:7
  pretty 14:5
  probably
  16:17
  problem 2:25
  promised
  18:17,24
  props 13:12
  13:14
  provided 20:7
  put 13:25
  14:5 16:2,6
  putting 18:9
  p.m 2:3

**— Q —**
question
  14:16 15:2
  questioned
  14:22
  questioning
  17:2
  questions
  18:16

**— R —**
ran 10:7
  read 17:13,15
  rest 4:5
  really 5:17
  6:4 9:20,21
  12:24
  recall 5:9
  14:22,23,24
  18:15 19:3
  record 2,4,16
  3:2,3,4 5:23
  9:24,25
  19:5

TRANSCRIPTS ONLY
(907) 276-0306

RECORDED INTERVIEW OF MIRANDA DiTULLIO
JUNE 1, 2004

Page 2

| | | | | | | |
|---|---|---|---|---|---|---|
| **RECORDED** | 12:9 13:2 | that'd 10:13 | **videotaped** | 11:16,18,23 | | |
| 1:1 | 13:24,25 | their 13:10 | 15:10 | 18 3:22 4:4 | | |
| **recorder** | 14:14 | things 8:7,8 | **videotaping** | 19 20:4 | | |
| 16:11 | seem 9:22 | 9:2 10:6,15 | 15:11 | 1943 1:23 | | |
| **recording** | 10:7 15:25 | 16:19,20 | | | | |
| 19:6 | sees 6:4,5 | think 11:1 | **W** | **2** | | |
| **refuse** 8:22 | **SERVER** | 12:9 18:2 | want 2:15,16 | 20 20:23 | | |
| **refused** 8:23 | 11:12,20 | **threatening** | wanted 9:22 | 2004 1:2 2:1 | | |
| **regard** 11:2 | service 7:5 | 16:1 | wasn't 4:1,14 | 20:8 | | |
| **regarding** | sexual 6:3 8:2 | threats 18:8 | 4:14 6:10 | 276-0306 1.25 | | |
| 12:10 | 10:19 13:2 | through 3:10 | 9:4 15:12 | 20:25 | | |
| **Regina** 9:14 | 13:4 16:24 | 3:11 8:21 | 16:3 | | | |
| **relationship** | she'd 10:14 | 20:4 | way 16:2 | **3** | | |
| 3:12 | Shirtleff 2:3,4 | time 3:17 | **Weldner** 2:11 | 3 20:8 | | |
| **remember** 5:9 | 2:9,10 3:4 | 13:18,20 | 18:21 20:7 | | | |
| 9:2 | 9:25 | 15:15 | **Weldner's** 2:5 | **9** | | |
| 9:17 12:11 | show 10:3 | times 15:2 | **welcome** | 907 1:25 | | |
| 12:11 15:16 | Side 2:2 | Tina 9:14 | 11:20 | 20:25 | | |
| 15:14 16:4 | since 18:13,14 | today 16:14 | **Well** 8:9 | 99517 1:24 | | |
| 16:5,11 | sleep 14:6,9 | 16:18 18:18 | 10:15 16:19 | | | |
| 17:13,18 | sleeping 14:3 | 18:25 19:2 | west 3:19,20 | | | |
| 18:3 | smoking 14:5 | together 17:4 | 5:21 4:1 | | | |
| **rep** 2:11 | 14:6 | told 3:22,25 | 5:14 8:21 | | | |
| **represent** | some 4:20 | 4:4,5,25 | 10:4 14:14 | | | |
| 2:11 18:20 | 16:13,14,14 | 16:13,14,14 | 18:2 | | | |
| **representing** | sound 13:10 | 16:18 18:18 | were 3:14,14 | | | |
| 2:5 | 13:16 | 18:25 19:2 | 3:17 4:4,20 | | | |
| **represents** | speak 2:13 | tr 7:6 | 4:21,25 5:6 | | | |
| 2:12 18:22 | speaking 2:25 | **transcribed** | 5:14 6:2,23 | | | |
| **Restaurant** | spike 13:24 | 20:5 | 6:23,24 8:4 | | | |
| 2:4 | 13:25 | **Transcriber** | 8:12,13,19 | | | |
| **result** 11:25 | state 2:17 | 20:2 | 9:5,17 10:5 | | | |
| 18:25 | 8:15 18:5 | **TRANSCRI...** | 11:15,18,23 | | | |
| **right** 4:23 5:1 | station 15:7 | 20:1 | 12:16,17 | | | |
| 5:3,6,23 6:8 | stealing 5:15 | transcript 1:1 | 13:13,14,23 | | | |
| 9:9,17,19 | 8:4 | 20:5 | 15:11,22 | | | |
| 10:23 12:20 | stepfather | **TRANSCRI...** | 16:1,1,6,20 | | | |
| 13:11,16 | 2:19,20 3:8 | 1:22 20:24 | weren't 15:13 | | | |
| 14:9 16:5 | 10:4 | traveler's | **We're** 9:25 | | | |
| 16:21 17:24 | still 3:5 4:1 | 5:21 | while 6:2 | | | |
| 18:6 | 10:1 12:4,7 | tricks 6:23 | work 2:11 | | | |
| **rights** 17:13 | stole 5:21 | tried 10:8,8 | 18:21,21 | | | |
| 17:15 | staff 9:5 | true 16:3 20:4 | worth 5:21 | | | |
| **rob** 10:14 | 10:12 14:3 | truth 19:2 | wouldn't 4:2 | | | |
| 13:10,14,17 | 16:3,9 | try 6:5 | | | | |
| **robbed** 9:6,7 | supplied 4:11 | trying 16:2 | **Y** | | | |
| 10:9 | supply 4:9 | turning 6:24 | yeah 4:7 6:1 | | | |
| **room** 16:5 | 16:21 | twice 13:19 | 7:15,18,19 | | | |
| **rooms** 16:6 | sure 17:21 | | 8:17 9:10 | | | |
| **rumor** 7:19 | | **U** | 11:17 12:6 | | | |
| **running** 7:3 | **T** | Uh-huh 3:24 | 13:1 14:3,9 | | | |
| 16:11 | take 10:12,12 | 6:6 7:2 | 14:13 15:24 | | | |
| ... ... | 14:9 15:4,7 | 10:20,22 | 17:23 | | | |
| **S** | talk 17:22 | 12:8 14:10 | young 6:12 | | | |
| **Salley** 5:10,12 | talking 7:17 | 15:9 | 12:17 | | | |
| 5:15 6:3,4,5 | 10:5 14:11 | **underage** | younger 5:16 | | | |
| 7:11,21,21 | tape 2:2 16:11 | 12:17 | 5:17 | | | |
| same 3:5 10:1 | 20:6 | **understand** | | | | |
| 16:15 | tell 3:8,20 | 7:13 18:5 | **$** | | | |
| saw 6:16 8:7 | 8:12,13,15 | 18:20,22 | $4800 5:21 | | | |
| 9:2 | 14:20,20,20 | unusual 14:5 | | | | |
| saying 17:18 | term 11:10 | upstairs 5:5 | **1** | | | |
| scheme 13:10 | Terry 2:4,10 | 12:18,22 | 1 1:2 2:1,2 | | | |
| see 3:14 4:1,2 | 3:4 9:25 | | 20:4 | | | |
| 6:2,4,13 | test 17:7 | **V** | 1st 2:3 | | | |
| 7:24 8:13 | testimony | Valley 12:12 | 1:45 2:3 | | | |
| 8:18 9:2,14 | 13:14 | very 19:5 | 1:50 2:3 | | | |
| 9:14 10:18 | thank 11:19 | vic 9:9,11 | 16 3:18 5:1,6 | | | |
| 11:1,5,7 | 19:5 | victim 9:8 | | | | |

TRANSCRIPTS ONLY
(907) 276-0306

EXHIBIT "B"

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| THE UNITED STATES, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CASE NO: A04-003 |
| | ) | |
| JOSEF BOEHM, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

SENTENCING HEARING RE

JOSEF BOEHM

HELD ON

THURSDAY, MAY 5, 2005

NORMAN SCHALL & ASSOCIATES
(800) 734-8838                                         87

1    Q.  And Dr. Mittelburger?

2    A.  Yes.

3    Q.  And have you had personal contact with Mr. Boehm?

4    A.  Yes, on severely occasions, on multiple

5    occasions.

6    Q.  Please explain to His Honor.

7        How much contact have you had with Mr. Boehm?

8    A.  I came to Anchorage first in late July of 2004

9    and spent the greater part of three days interviewing

10   Mr. Boehm on four occasions, total of about three hours,

11   face-to-face contact, and then I returned at the end of

12   October in 2004, over two days had three additional

13   sessions with Mr. Boehm lasting about eight hours.

14       So I've spent about seventeen hours talking with

15   Mr. Boehm, and other times I've met him, on other visits

16   here.

17   Q.  All right.  And have you reviewed the

18   brain-imaging testing that's been done in this case?

19   A.  Within the limits of my knowledge.  Correct.

20   Q.  But you, in turn, are aware of Dr. Cowell's

21   interpretations of those tests?

22    A. Yes, I am.

23    Q. In fact, was some of that testing done pursuant

24  to recommendations made by you?

25    A. Yes. After my first visit -- interviews of

NORMAN SCHALL & ASSOCIATES
(800) 734-8838                           99

1   psychosis goes away all by itself.

2        So what you get into -- and this is how I said

3   earlier that, you know, given his pattern of use, the

4   amounts of use, he would be addicted and would be impaired

5   24 hours a day. A lot of this is not just from the acute

6   use, but also the toxic affects, sleep deprivation,

7   malnutrition. They're associated with this extreme level

8   of cocaine addiction.

9   Q.  Now, Doctor, by way of follow-up -- well, first

10  of all, what's your understanding, including your

11  observation of the testimony of Bambie Tyree, as to

12  approximately how much cocaine Mr. Boehm was using during

13  the relevant periods as to these offenses?

14  A.  She was specific that they were each using an

15  ounce or more of cocaine -- crack cocaine per day and that

16  they would use it in patterns of runs, which means

17  continuous use without sleep, for up to a week.

18  Q.  Can you give us some perspective on that from

19  your experience as to how much cocaine that is?

20  A.  In my experience, I've never heard of such a

21  daily dose of crack cocaine. The most that I have

22   experience with before is twelve to fifteen grams, say

23   almost a half-ounce.

24        But Mr. Boehm didn't give me this history,

25   because I think he -- he doesn't remember very well what

NORMAN SCHALL & ASSOCIATES

(800) 734-8838                                        100

1    was going on, it just being given to him, but Ms. Tyree

2    was very, very clear that it was an ounce a day or so per

3    person.

4        Q.  And what -- can you give us some idea of what it

5    means to go on a run for a week?

6        A.  It means you just continue to use crack cocaine.

7    And since it's so short-acting, you may be using it every

8    five to ten minutes.  Because the body is so wired, so

9    excited, people are unable to sleep.  They're jittery,

10   they're nervous, they're jumpy, and so they use -- keep

11   chasing that high around the clock.  And according to --

12   for days at a time, but Ms. Tyree said they would use for

13   a week or more at a time.

14       I had one case that I was involved in, the person

15   was on a run for close to three months on methamphetamine,

16   so --

17       THE COURT:  On methamphetamine?

18       THE WITNESS:  On meth.

19       But cocaine is the same.  It just doesn't last as

20   long.  They're indistinguishable effects.

21       THE COURT:  Physiologically?

22    THE WITNESS: Physiologically; right.

23    BY MR. WIDENER:

24    Q.  Can you -- all right.

25    Well, first, what portions of the brain are

NORMAN SCHALL & ASSOCIATES

113

(800) 734-8838

1    first of all, to your summary on your April 20th report --

2    it's at Page 7 of your report -- and I'm going to ask you

3    back in the body of the report how that information

4    relates to your summary.

5        But you make the statement -- you have it there,

6    the summary?

7    A.  Yes.

8    Q.  "Given Mr. Boehm's described use of high doses of

9    crack cocaine between 2001 until 12/23/03, it would have

10   been impossible for him to be the leader of any type of

11   conspiracy.  Even without any type of underlying brain

12   damage the amounts and pattern of use of crack cocaine by

13   Mr. Boehm would have caused such extreme cognitive

14   impairment as to prevent him from being the principal in

15   any type of conspiracy which required planning and

16   execution in order to accomplish a given purpose at some

17   time in the future."

18       "During this about three-year period of cocaine

19   addiction Mr. Boehm would have been engaged in a

20   continuous and repetitive pattern of seeking more cocaine,

21    using cocaine, recovering from the effects of prior use of

22    high doses of cocaine."

23          "Under these conditions he would have been

24    significantly impaired at all times.  All available

25    information is most consistent with a conspiracy between

NORMAN SCHALL & ASSOCIATES          114
(800) 734-8838

1    Ms. Tyree, Mr. Bolling and Mr. Williams to keep Mr. Boehm

2    supplied with crack cocaine so as to get money, in other

3    words, steal from him."

4         "Available information is consistent with

5    Mr. Boehm being among the victims of this conspiracy.

6    Given the amounts of patterns of crack cocaine used by

7    Mr. Boehm from about 2001 to 12/03, he would have been

8    functioning in a survival-type mode where the only issue

9    of importance would have been to continue to use crack

10   cocaine with no consideration of possible future

11   consequences."

12        And, obviously, that is your opinion; correct?

13   A.   That's correct.

14   Q.   Now, going back then to Page 4 of your report, at

15   the bottom you make some observations about Mr. Boehm not

16   having control of his house, the actions of Ms. Tyree, and

17   then you make specific references to -- Page 5 -- to

18   certain statements that support your opinion.

19        Please, explain your opinion in that regard.

20   A.   The first group on Page 5 is people's references

21   that Mr. Boehm was not in control of his house or what was

22    occurring around him, and these were just selected.  There

23    were a lot more similar-type references, but these were

24    basically from witnesses that were at the house at

25    different times that were asked what they had observed

NORMAN SCHALL & ASSOCIATES
(800) 734-8838

EXHIBIT "D"

1  KENNER LAW FIRM, P.C.
   David E. Kenner, SBN 41425
2  Brett A. Greenfield, SBN 217343
   16000 Ventura Boulevard, PH 1208
3  Encino, CA 91364
   818 995 1195
4  818 475 5369 - fax

5  WADE, KELLY & SULLIVAN
   733 W. 4th Avenue, Suite 200
6  Anchorage, Alaska 99501
   (907) 561-7743
7  (907) 562-8977 - fax

8  Attorney for Defendant Josef F. Boehm

9              IN THE UNITED STATES DISTRICT COURT

10                  DISTRICT OF ALASKA

11

12 Sally C. Purser,                  )   DECLARATION OF TERRY SHIRTLEFF
                                     )
13          Plaintiff,               )
                                     )
14          v.                       )
                                     )
15 Josef F. Boehm, Allen K.          )
   Bolling, and Bambi Tyree,         )
16                                   )
           Defendants.               )
17                                   )   CASE NO.: A05-0085 (JKS)
                                     )
18 ─────────────────────────────────)

19

   DECLARATION OF TERRY SHIRTLEFF
20

21    I TERRY SHIRTLEFF, say and declare as follows:

22 1.  I conducted the interviews of Salley Purser and Miranda Ditullio

23     and have personal knowledge of the accuracy of the audio

24     recordings and transcripts of said interviews and know them to

25     be accurate and correct;

26 2.  I conducted the interviews on behalf of Josef Boehm and while

27     employed as his investigator;

28

                              1

                DECLARATION OF TERRY SHIRTLEFF

3. Prior to the commencement of each interview I told both Ms. Purser and Ms. Ditullio that they were being recorded.

4. I have listened to the audio recordings of each interview and know them to be complete, accurate and encompassing the entire interview;

5. I have reviewed the transcripts of each interview and know them to be complete, accurate and encompassing the entire interview;

6. The interviews of Ms. Purser and Ms. Ditullio were given at their own free will without any promise of reward, threat or coercion.;

7. I have given this declaration of my own free will without any promise of reward or threat of coercion. I declare under penalty of perjury under the laws of the State of California that this declaration is the truth and I will testify consistent with if called to do so in a court of law. I have had the opportunity to read and revise this declaration prior to signing it.


Executed this 17 day of January, 2007 at Anchorage, Alaska.

STATE OF ALASKA

THIRD JUDICIAL DISTRICT      TERRY D. SHURTLEFF

SUBSCRIBED AND SWORN TO before me this ____ of January, 2007


Notary in and for the Sate of Alaska
My Commission Expires 3-16-10

2

DECLARATION OF TERRY SHIRTLEFF

EXHIBIT "E"

Michael C. Rose, Ph.D.
Clinical Psychologist
Member, American College of Forensic Psychology

1400 A Street Suite 210
Anchorage Alaska 99501
(907) 277-0807 Voice
(907) 277-0081 Fax
mcr@cci.net

January 30, 2006

Darryl Jones
109 West Sixth Avenue
Suite 200
Anchorage Alaska 99501

                              **Re: Salley Purser**

Dear Mr. Jones:

I understand you need information regarding Ms. Purser's problems related to
employability. According to Ms. Purser, she has been unable to sustain employment for
any length of time due to transportation difficulties, personal and other conflicts with
others, lack of motivation and/or "the job doesn't interest me." Psychologically, the
recent assessment findings show Ms. Purser is very confused, acutely stressed, and
emotionally unstable. In addition, she is a new mother and is struggling with the
demands associated with caring for a young infant without any source of social support.
Consequently, considering the number of stresses she has been experiencing, it is not
surprising she has not been able to sustain employment for any length of time.

Ms. Purser will probably be unable to maintain employment until she experiences
improved psychological stability. Her current plan to seek vocational training is probably
a realistic one at present given the problems she is facing, and it has the potential to
provide structure and skill-training that should improve her chances of finding
employment that is more suitable to her interests and aptitude. Without vocational
training, she faces the prospect of accepting menial labor positions that will do little to
advance her career or provide a living wage so that she can provide for herself and her
child.

She is currently receiving mental health treatment that has been beneficial to her, and she
should be encouraged to continue in treatment with her therapist to address the
psychological problems she has, even though the current therapeutic relationship has
some drawbacks (e.g. it is with a court-ordered therapist, etc.). Once she has completed
treatment with her current therapist, if Ms. Purser elects to seek other treatment with
another provider, I would be happy to provide her a list of potential treating professionals
from which she could select another mental health provider. She could also elect to see
me if she felt treatment here would be beneficial.

As noted in the evaluation report, Ms. Purser will likely need continued and extensive
psychotherapy to address her psychological problems for at least one year to two years.
She should also complete outpatient substance abuse education/therapy with special

emphasis on relapse prevention since she is significantly addiction-prone as well as relapse-prone. It would be helpful for Ms. Purser to consider couple therapy with her boyfriend if they intend to form a family with their daughter. She would also benefit from respite services that would assist her with her daughter, Sincere, and give her some relief from caring for a four-month-old infant while trying to deal with the distressing complex of problems she is attempting to resolve.

I hope this information is useful to you in your work with Ms. Purser. Please contact me if you need elaboration of the above.

Sincerely,

Michael C. Rose, Ph.D.
Clinical Psychologist

Michael C. Rose, Ph.D.
P. O. Box 242074
Anchorage, Alaska 99524-2074
(907) 277-0607 Voice
(907) 277-0061 Fax
mcr@gci.net Email

### Psychological Evaluation

Name: Salley Purser                          Date of Birth: 3-29-86
Age: 19                                      Date of Evaluation: 1-6-06
Education: 9th                               Occupation: Unemployed
Marital Status: Single

Introductory Information:

Darryl Jones, attorney for Sally Purser, referred Ms. Purser for a psychological evaluation. The purpose of the evaluation was to address her current psychological status and to make recommendations with respect to treatment. According to Ms. Purser, as a 15-year-old minor, she was provided drugs and sexually abused by Joseph Boehm.

This report is confidential and solely for the use of Mr. Jones. There were no information sources available for review prior to completing the evaluation.

Background Information:

Ms. Purser reportedly grew up in Anchorage and was raised by her biological parents until age nine at which time her parents divorced and she lived with her mother until she was about 15 years old and then moved to Washington briefly before returning to live in Alaska.

She reported very negative feelings toward her parents. Her relationship with her father has been troubled for some time. She remembered him being "violent toward my mother, and I grew up watching him beat her, and I woke up one time and he was choking her." She described him as an "alcoholic who is just violent, and he was bad when he was drunk." He now lives in Utah where he is employed as a truck driver.

The relationship with her mother "used to be good, and we used to get our hair done together and our fingernails done together, but that fell apart when my parents broke up, and she got a boyfriend who used to pay for everything." She remembered her mother and boyfriend "used to go out all the time, and my brother and I would be home drinking beer they left in the fridge, and her boyfriend would leave for months at a time but send the money to pay for bills, and then she started meeting some bad people and started using cocaine and crack – she is still a crack head." Ms. Purser has no idea where her mother is, and "I don't know how to get hold of her."

Salley Purser
Psychological Evaluation
Page 2 of 11

She remembered, "my mom used to take out her aggression on me, and she used to hit me, and she once sat on my back and almost snapped my back – I don't know why she did that, but then I started fighting back."

Ms. Purser has a brother who is one year younger than her. They had difficulty getting along during childhood and adolescence, and "we fought physically, and he used to hit me in the face, but he just called and apologized for hitting me in the face with a closed fist, and he used to chase me around the house with a horse whip, and I used to chase him around with a stick, but now it's good between us, and he is like my best friend." They also sued to "argue because he didn't want me smoking crack."

Asked to describe her childhood, she replied, "I really don't think I'm that messed up from my childhood, but I am numb to things – I don't have emotion – I show anger but no other emotion, but I can kiss and hug my daughter."

Her adolescence was "fucked up because I was smoking dope and before that smoking weed – addiction runs really bad in my family."

Ms. Purser gave a fairly rambling account of her life that included drug abuse, physical and sexual abuse, and problematic relationships. After she left home at age 15, she moved in with an uncle in Washington, but "he was a pervert – he was sick and tried to control me, and in order for me to go out, he made me go topless, and he would take pictures of me – that lasted nine months." Her uncle also reportedly "tried to touch me and tried to give me massages, and I told my aunt about this after I left, but she didn't believe me, and she told me never to contact her again."

She left Washington to get away from the abuse and returned to Alaska to live with her mother until she was about 17 years old, and "then I started smoking crack with my mom – I didn't really live with her, but my stuff was at her home, but I was never home." Instead, "I was out running around and smoking weed – I started smoking weed a lot when I was 13 years old, and then at 15, I started smoking crack, but I didn't like what I was doing, so I quit by myself and got a boyfriend, but that lasted about a year, and then we broke up, and I went back to drugs." Asked where she got her drugs, she replied "from Joseph most of the time – the majority of the dope came from him– I met Joseph about two weeks into smoking crack, and I hung out with him for three months and was sucking dick for hits and walking around naked in front of a 60 year-old man, but I got away from that and started smoking weed again." However, "I got depressed after I broke up with my boyfriend, so I went back to Joseph's and stayed there for two years."

During that time, "my mom was blackmailing me daily to get drugs, and he (Joseph) flew us to Seattle and gave me like two grand and my mom three grand, and I went down to Washington because my mom was too stuck on drugs." According to Ms. Purser, Joseph sent one of his drug dealers to Seattle with her "because I could not go by myself – I was too young, and he put me in a hotel and we went shopping." Ms. Purser indicated, "Joseph never gave me money, but he gave it to the drug dealer to spend on me, and then my mom came into town five days later and that lasted about a month, and then we moved in with my mom's friend and stayed there for like a month and a half, and then my mom got her own apartment with me and my brother."

Sallay Purser
Psychological Evaluation
Page 3 of 11

Her mother's drug abuse worsened, and "she lost the apartment, and I was almost 18 then, and I started walking the streets, but I was also on probation down there because I got in a fight with my mom and spent 30 days in jail." After she was released, "I started using again, and the cops found me because I was not working with my PO or checking in, and I got put in jail for another month."

After she turned 18, "they put me in an adult jail for two weeks and then let me off on probation, and when I get out, I stayed sober, and I stayed with one of the old drug dealers because he told me to call him when I stayed sober, and I could stay with him, and then I came up here for grand jury."

After she returned to Alaska, "I caught a charge for possession of crack cocaine, and I spent four months in jail up here in 2004, and when I got out, I went to treatment but got kicked out and went back to jail for a month and then got released to my girlfriend who is 20 years old." After that, she and her roommate, Kathryn, got an apartment together.

Ms. Purser later discovered she was pregnant, and "I went into a halfway house after Christmas and then went to Passage House and got out and had my baby, and Kathryn had her baby, too, and we decided to be more mature and try to work things out together." Ms. Purser's daughter, Sincere, is now four months old.

She indicated her brother and father disapprove of her involvement with her African-American boyfriend who is the father of Sincere. She believes her brother and father are "both racists because they don't like my baby being half-black."

Ms. Purser stated, "I don't like either of my parents – I love them, but I don't love my mom, and I don't respect my dad – when he calls, I hang up on him all the time – he's a racist."

Ms. Purser's relationship with her boyfriend, Jerald, is apparently an on-again/off-again relationship. She indicated she has "love for him, and I was in love with him, but we have done too many bad things to each other, and I cheated on him because I don't like anyone getting too close to me – I ran out and had sex with someone because he was getting too close to me."

She described being in some frightening situations recently, "but it didn't scare me –it scared the shit out of my roommate, but didn't scare me – I didn't feel anything – it's weird – the only thing I was thinking about was my daughter, but I don't know why i wasn't scared – maybe it's because I have seen so much shit that nothing is new to me, and when something really good happens, I don't get excited."

She admitted, "today I cried for the first time in six months, and I think I'm going through the postpartum blues – I don't really need a kid now, and it's really hard, and I am broke and struggling – I had to have my dad pay my rent, and I need baby wipes, and I need diapers, and I don't need formula because WIC helps me with that, and I never have time for myself."

She is also concerned that her roommate is "drinking every night, and her kid is at home when she does that, and I don't want my daughter to go through that – I was more responsible when I was at Passage Way."

Salley Purser
Psychological Evaluation
Page 4 of 11

She is worried because "I don't know what to do with my life because I was smoking crack for three years, and now I don't know what I'm doing, but at least I'm not 'jonesin.'"

Medical History:

She believes she is in generally good health, but she worries that she smokes socially, and "I drink every once in awhile."

Prior significant illnesses included asthma. Previous surgeries included a myringotomy. Asked about past injuries, she reportedly suffered a "broken rib after I had a seizure that was drug-induced, and one of the crack-heads did CPR wrong and broke my rib." She denied any history of head injury or loss of consciousness aside from "drug-induced seizures."

She denied sleep or appetite problems. Her weight is stable at 110 pounds on a 5'3" frame. She is trying to gain weight, but "I don't have money to eat."

She is not currently medicated. She denied drug or non-drug allergies. She denied menstrual difficulties.

Ms. Purser was reportedly psychiatrically hospitalized at North Star Hospital when she was a teenager after her mother "thought I was depressed and thought I was trying to kill myself." She was there about one week and then discharged. According to Ms. Purser, "my mom claims I am Bipolar because there is 'me' and then there is 'angry me,' but I don't think I'm Bipolar." She denied most symptoms of Bipolar Disorder. However, she reported a strong family history of Bipolar Disorder in her mother, her maternal grandmother, and other family members.

In the past, she was apparently medicated with Zoloft and Prozac as well as an antipsychotic medication, but she did not believe the medications were of any benefit.

She is currently in individual psychotherapy with Anne Stockman, and she has also seen other therapists. She believes she has a good working relationship with Ms. Stockman, and "she made me realize that I do things because I don't trust people getting close to me, and I don't want to have these feelings." Asked if she was able to discuss everything about her past with her therapist, Ms. Purser replied, "I don't tell my therapist everything because I prefer to keep Joseph in the past – I try not to think about that, but I'm being completely honest with you."

As noted previously, she reported she was physically abused primarily by her mother. She denied sexual abuse as a child aside from "my uncle taking pictures of me naked and making me lay on a massage table to massage me." However, when he began to massage her close to her vagina, "I got off the table."

She admitted to suicidal ideation about six or seven years ago, and "I have tried to commit suicide, and I talked about it – one time I tried to cut my wrists with a pen." However, she denied any recent thoughts of self-harm because "I don't want to die – I have a daughter to live for, and I want to live to see my daughter's kids."

Salley Purser
Psychological Evaluation
Page 5 of 11

She denied any history of hallucinatory phenomena.

Asked to describe her mood over the past week, she replied "down, depressed, numb, and today I had a bad day."

Substance Use History:

She occasionally smokes cigarettes once or twice a month. She likes coffee, but "lately I can't afford it."

She uses alcohol about once or twice per month and typically drinks beer because "I don't like hard alcohol." She had one beer about three days ago, and she denied any problems related to alcohol use. She has no history of DWI or violence associated with alcohol use. In the past, she used to have "blackouts when I was younger because I used to drink to get drunk when I was about 16, but I was never a fiend for alcohol."

She first smoked marijuana around age 11 but started smoking it regularly when she was about 13 years old. Her use of marijuana increased with time, and "I would wake up and load a bowl, and I would go to sleep at night after smoking it – I bought it with my mom's money, and it made me hungry and relaxed so I could just chill."

She believes she started using cocaine around age 15, and "I snorted it before I smoked it." She believes she became addicted to cocaine after the nine-month relationship with her boyfriend ended, and "I just could not put it down after that." She remembered, "when I took my first crack hit, I had that outer-space feeling that I really liked – I enjoyed the high, and I never felt like I had enough."

She smoked methamphetamine "just to keep me awake, and it made me motivated – it made me clean up and put makeup on."

She also tried XTC, and "that's what I got expelled from school for was selling ecstasy in 10th grade." She "really liked it – it feels good, and XTC intensifies your nerves and even taking a deep breath feels good." She indicated, "I never got horny on it, but it would make me want to make out."

She has "snorted Oxy's and Vicodin, but downers are not my favorite – I like uppers." She also smoked heroin laced with cocaine, but "it didn't do shit but settle your 'jones.'"

She denied use of LSD or any other illicit substance, including inhalants.

Educational History:

When Ms. Purser attended elementary school, she reportedly did well academically and had no behavioral difficulties.

Salley Purser
Psychological Evaluation
Page 6 of 11

In junior high, she earned average grades, but "I was more into what I was wearing and into boys." She was apparently suspended from school after she instigated a fight.

Ms. Purser attended Service High School for three months after she finished ninth grade in Spokane, but "when I started 10th grade, I got kicked out and never went back." She later earned a GED in March 2004.

Relationship History:

Ms. Purser believes she has been in three serious relationships, and "twice I said I love you, and meant it." Her first serious relationship ended after about nine months, and she subsequently returned to using cocaine after the breakup.

She has been in her current relationship for about 1 ½ years, and her boyfriend, Jerald, is the father of her daughter. He is apparently "going to school for welding, but he likes to party."

Ms. Purser denied she was promiscuous in her teenage years but believes she is more promiscuous now.

In the future, she would like to be married, and "I want to have a house and cars and toys, and I think we (she and Jerald) can work it out and stay together."

She admitted experiencing domestic violence with her first boyfriend who "smacked me around a little, and I had another boyfriend who used to hit me, and I had a couple of dope dealers that would hit me."

Vocational History:

She recently was employed, but "I can't keep a job longer than two months because I either quit showing up or have conflict, or the job doesn't interest me, and I have no motivation at all." She indicated, "the longest job I had was about three months, and I kept that because they drove me to work – I don't have transportation, and asking somebody to drive me gets annoying."

In the future, she hopes to complete schooling at Academy Hair Design in March, and "I have this grant to go to college – it's Joseph's grant for like $100,000, and it can pay for education, treatment and counseling."

Legal History:

She admitted she has been arrested "four or five times." Her first arrest was for "stealing my mom's car, and I went to 'juvy' for that." She was also arrested for assaulting her mother. Her other arrests are related to "a run away, possession, and probation violations." She is currently on federal probation related to cocaine possession.

As noted previously, Ms. Purser met Joseph Boehm when she was about 15 years old, and he became her primary supplier of drugs in exchange for sexual favors. She admitted Joseph "likes

Salley Purser
Psychological Evaluation
Page 7 of 11

pretty girls and likes to smoke crack, and he tries so hard to get off – he had to take like three Viagra to get hard, and he is uncircumcised and nasty – I can't believe I did that." She believes she had sex with Joseph about three or four times, and "I gave him head a handful of times, but most of the time I would dyke it out with another woman – he liked watching women on women." She admitted she performed sex acts "to get drugs."

She admitted she was involved in prostitution while living in Washington. She added, "I was not a crack whore down there, but I was a crack whore for Joseph, and I would even bring other girls to him – I got a 13 year old girl to suck his dick and get dope for it."

She denied any symptoms of hypervigilance or an exaggerated startle response. However, she admitted she has occasionally experienced flashbacks about sexual behavior with Joseph when she has been sexually involved with her boyfriend, and "one time I had a flashback about Joseph and started crying – I wanted to puke." She is angry with "the fact that you have to do the whole dope game in order to get what you want – you have to fuck, and it made sex meaningless – I'm not saying I am damaged goods, but at the same time I am, and I certainly don't feel sacred anymore." She remembered a number of disturbing memories relative to sexual involvement with Mr. Boehm. She recalled, "Joseph would blow crack smoke up my ass – it was just a freak thing for him – he said it felt good, and he wanted me to do it to him." She added, "I am really trying hard to be completely honest and to speak the truth, even if it hurts."

It has now been at least two years since she had any formal contact with Joseph. Asked how she felt now that she has been away from him, she replied "I feel like I am more controlling, and I am the dominant one in a relationship – I like wearing the pants and being the man – I guess I was chased so long that I want to feel like I am the one who chases."

Asked how she felt about Joseph, she replied "I felt sorry for him – everyone was playing him and stealing from him, but I don't feel sorry now – now I'm sober, and I know he let everyone use him."

Asked what she thought Joseph's future should be, she replied, "he should die in jail – I don't ever want to know that he is out and free because I would not feel free." She continued, "I have a lot of memories about what happened, and sometimes I have dreams, but I try hard not to let it bother me – I know that happened to me, but I'm not going to let that happen to me again." She recognizes now, "if I would've stayed in school and if I never smoked dope – but I still fiend for dope, and I don't want to end up like my mom – I don't want to be like her."

Assessment Procedures:

    Minnesota Multiphasic Personality Inventory 2 (MMPI-2)
    Millon Adolescent Clinical Inventory (MACI)
    Detailed Assessment of Posttraumatic Stress (DAPS)
    Substance Abuse Subtle Screening Inventory -3 (SASSI-3)
    Diagnostic Clinical Interview

Salley Purser
Psychological Evaluation
Page 8 of 11

Behavior During Assessment:

Ms. Purser is a 19 year old, single, unemployed, Caucasian woman who presented as slender and attractive with casual dress and appropriate grooming and hygiene. When she came into the examination room, her face was tear-stained, and upon inquiry about this, she stated she was "having a bad day." Nevertheless, she was able to complete all assessment procedures and the interview without difficulty and was extremely polite and courteous throughout. No obvious sensory visual or auditory difficulties were observed. She was able to read and produce written responses to each of the items on the assessment inventories without difficulty. She exhibited appropriate skill with fine and gross motor movements. Speech was relevant but rapid and mildly pressured. Affect was labile but with an overall depressed tone. There was no overt evidence of thought disorder, delusional thinking, or loosened associations, and her thinking was confused but ultimately goal-directed. Reality contact appeared good. The assessment results were considered a reliable and valid estimate of her current psychological functioning. The validity of her test results did not appear affected by deficiencies in vision or hearing or because of drug ingestion. Tests administered to her were current, appropriately normed, and individually administered in accordance with standardized procedures.

Psychological Test Findings:

The Minnesota Multiphasic Personality Inventory – 2 (MMPI-2), is a 567-item, objectively-scored adult personality inventory that assesses psychopathology across a wide range of possible psychological problems. Her profile was valid and indicated she is experiencing significant psychological problems, although she may have been exaggerating some of her complaints. Clinical patients with her validity profile are often confused and distractible and may be exhibiting a high degree of distress and personality deterioration. Individuals with her clinical profile (4-6-8) are experiencing chronic psychological maladjustment. They are immature and alienated, and they tend to manipulate others for their own gratification. They are also self-indulgent, hedonistic, and narcissistic. They may be aggressive with others, behave impulsively, and act out problems. They rationalize their difficulties and often blame others for their problems. They are also hostile, resentful, and irritable. They also tend to seethe with anger, and their sensitivity to criticism can lead to unpredictable and irrational outbursts. Interpersonally, these individuals feel others do not understand them and are unsympathetic. They behave in a somewhat aloof, cold, callous, and uncompromising manner, often attempting to advance themselves at the expense of others. Their lack of trust often interferes with the ability to develop intimate relationships. Finally, they are addiction-prone to drugs and alcohol.

Ms. Purser's MMPI-2 findings also indicate she is experiencing depressed mood and is preoccupied with feeling guilty and unworthy. She feels somewhat self-alienated and expresses some personal misgivings or a vague sense of remorse about past acts. She is regretful and unhappy about life and feels anxiety and worry about her future. She feels hopeless at times, condemned, has low self-esteem and is bothered by feelings of inadequacy. She worries about her physical health, feels that life is no longer worthwhile and worries she may be losing control of her thought processes. She views the world as a threatening place, sees herself as having been unjustly blamed for others' problems, and feels that she is getting a raw deal out of life.

Salley Purser
Psychological Evaluation
Page 9 of 11

Ms. Purser also completed the Millon Adolescent Clinical Inventory (MACI), a 160-item,
objectively scored clinical personality inventory. This test is normed on clinical populations (i.e.,
adolescents up to age 19 considered to have psychological problems and referred for treatment).
On the MACI, she produced a valid profile, and there were no test-taking attitudes that would
distort the results. Individuals with her profile type feel depressed, dysphoric and morose. They
typically have defeatist and fatalistic attitudes about the present and the future. They feel the
weight of the world on their shoulders, and they doubt they can make positive changes. Their
pessimism often translates into low self-esteem and guilt regarding their inadequacies. They
typically have few friends since interacting with them is seldom rewarding and is more often
draining. These individuals also experience intense ambivalence, labile moods, unpredictable
behaviors, capricious thoughts, and identity diffusion. There is pervasive instability and
inconstancy that permeates all aspects of their lives. They usually experience periods of marked
behavioral and emotional dysregulation, and this instability may be indicative of failure to develop
an integrated personality. They have great difficulty maintaining relationships because their
perceptions range from idealization to devaluation. They have dependency needs that have never
been met, and although they seek attention and affection, they cannot tolerate closeness. Fears of
separation and abandonment may lead them to act in desperate ways in order to hold on to others
and save them from being alone and feeling empty. On the other hand, fears of engulfment can
contribute to angry explosions, which drive others away. Life is a constant struggle for them with
frequent upheavals. These individuals are also impulsive and engage in risky acting out behaviors.
There is little planning preceding their actions, and they are unable to focus on the more ordinary
concerns of adults their age. Their inner turmoil leaves them ill-prepared to take on new challenges
and responsibilities, so they have tremendous difficulty with transitions in life. Sometimes, they
can become self-destructive. She reported her family relationships are tense and conflicted with a
sense of estrangement from parents and indications of significant family pathology. Her profile
also showed she is extremely addiction-prone to substances and prone to relapse, especially when
stressed. She acknowledged feeling sad and discouraged. She has low self-confidence, is socially
withdrawing, and perceives few social supports in her life. Individuals with her assessment
findings tend to display borderline features that are challenging in treatment and require
tremendous resources of time and energy.

To assist in evaluating Ms. Purser's current psychological status and suspected PTSD symptoms,
she completed the Detailed Assessment of Posttraumatic Stress (DAPS), a 104-item, objectively
scored psychological test designed for use with individuals who may have experienced a significant
traumatic event. The DAPS has two validity scales that assess for either tendencies to deny
symptoms others commonly endorse (Positive Bias) or over-endorse unusual symptoms others
rarely endorse (Negative Bias). On this test, Ms. Purser' validity scales were within normal limits.
On the clinical scales, she produced significant scores on scales indicative of a positive diagnosis of
Posttraumatic Stress Disorder. On the Detailed Assessment of Posttraumatic Stress, Ms. Purser's
validity scales were within normal limits. The clinical scales indicate she is experiencing a number
of symptoms that strongly indicate the presence of Posttraumatic Stress Disorder. The traumatic
event that bothered her the most was "being forced to give oral sex to an older man. I was 15 years
old, and he was almost 60. I was also using drugs." The test results showed significant avoidance
responses relative to the traumatic stress she is reporting, and she appears to attempt to avoid
people, places, conversations and situations that might trigger re-experiencing of the events. There
is also evidence of emotional numbness and attempts to suppress thoughts related to the traumatic

Salley Purser
Psychological Evaluation
Page 10 of 11

event. There are also indications of autonomic arousal, such as tension, sleep difficulties, irritation, and problems with attention and concentration. She appears to feel emotional distress associated with high anxiety, irritability, and feeling "on edge." There is some evidence of flashbacks, intrusive memories and dreams of the traumatic events. There are also indications of addiction-proneness to substances. There were no indications of suicidal motives, ideation or behaviors.

On the Substance Abuse Subtle Screening Inventory 3 (SASSI-3), Ms. Purser's responses indicated she has a high probability of having a Substance Dependence Disorder. She appears significantly addiction-prone to drugs and alcohol.

Diagnostic Impression:

| | |
|---|---|
| Axis I: | Cocaine Dependence, In Remission |
| | Posttraumatic Stress Disorder, Chronic |
| | R/O Mood Disorder NOS |
| Axis II: | Developing Borderline Personality Disorder features |
| Axis III: | History of asthma |
| Axis IV: | Psychosocial stressors: victim of sexual and physical abuse, relationship discord, single parent with new baby, problems with friends, difficulty maintaining employment, financial problems, legal difficulties, difficult transition to adulthood, mental disturbance in family members |
| | Severity: 4 - Severe |
| Axis V: | Current GAF: 50 |

Summary:

Salley Purser is a 19 year-old, single, Caucasian mother of a four-month-old daughter, Sincere, who experienced a chaotic upbringing by substance dependent and physically abusive parents who were also very neglectful and unsupportive. She started using drugs at an early age and was marijuana dependent by age 13 and cocaine dependent by age 15. She started getting her drugs from Mr. Boehm shortly after she started using crack cocaine, exchanging sexual favors for the drugs she sought, and this sex/drug exchange continued for about two years. Her psychological problems escalated with her addiction, but she now claims to be abstinent from the use of cocaine and other illicit substances. She is in a relationship with the father of her four-month-old daughter, but the relationship appears to be rather stormy. Ms. Purser is in individual psychotherapy and believes she is making headway in treatment.

The current assessment findings indicate Ms. Purser's history, adjustment and behavior appear to meet diagnostic criteria for Cocaine Dependence, In Remission; Posttraumatic Stress Disorder, Chronic; R/O Mood Disorder NOS and developing Borderline Personality Disorder features. It is difficult to know if some of her symptoms are indicative of a Borderline Personality Disorder or a Mood Disorder given her significant family history of Bipolar Disorder.

Undoubtedly, Ms. Purser is in need of ongoing mental health and substance abuse treatment. It appears her problems began to escalate about the time she started using drugs, and she had little effective parental nurturance or guidance during her formative years that would have helped her

Salley Purser
Psychological Evaluation
Page 11 of 11

negotiate adolescence. While all of her problems are not solely caused by her involvement with Mr. Boehm, they appear to have dramatically escalated once she became addicted to cocaine and she began exchanging sexual favors for drugs. Consequently, the approximately two-year period with Mr. Boehm dramatically aggravated problems that were present or developing, and her involvement with him appears to have been a strong causative factor in creating the psychological problems she now experiences.

Ms. Purser will need continued and extensive psychotherapy to address her psychological problems for at least one year to two years. She should also complete outpatient substance abuse education/therapy with special emphasis on relapse prevention since she is significantly addiction-prone as well as relapse-prone. It would be helpful for Ms. Purser to consider couple therapy with her boyfriend if they intend to form a family with their daughter. She would also benefit from respite services that would assist her with Sincere and give Ms. Purser some relief from caring for a four-month-old infant while trying to deal with the distressing complex of problems she is attempting to manage or resolve.

Unfortunately, therapy with women with her assessment findings is very demanding. Their unpredictable behavior and emotions, pervasive dysphoric state, disheartened outlook, and low self-esteem are formidable obstacles to successful treatment. Fortunately, she appears to have a healthy therapeutic alliance with Ms. Stockman that could go a long way toward helping her manage the dysfunctional behavior patterns she has developed.

Ms. Purser's vocational goal is to enter Academy Hair Design in the near future to receive training that would enhance employability. Whether she can accomplish this goal at this time considering the psychological problems she is facing is difficult to say. Her therapist is probably in a better position to make a recommendation regarding this issue in collaboration with Ms. Purser. In any event, if she enters this training program, she will need to find a responsible, reliable and mature caretaker for Sincere while she is attending school.

Ms. Purser needs to insure Sincere is safe in her current home environment, especially in light of her concerns about her roommate's drinking. She mentioned she was doing much better when she was in Passage House, and it may be necessary for Ms. Purser to consider returning to this program or making other living arrangements if her roommate's substance use continues in such a manner that might threaten Sincere's safety, health or development.

Michael C. Rose, Ph.D.
Clinical Psychologist

Vitae of:
## MICHAEL C. ROSE, Ph.D.

Office:      1600 A Street  Suite 210
             Anchorage, Alaska  99501
             (907) 277-0607 Voice
             (907) 277-0061 Fax
             mcr@gci.net

### EDUCATION

1979 Ph.D.   Clinical Psychology, Department of Psychology
             Brigham Young University

1978-79      Internship in Clinical Psychology
             Timpanogos Community Mental Health Center
             Provo, Utah

1975         M.A., School Psychology
             Department of Educational Psychology
             Brigham Young University

1973         B.S., Psychology
             Department of Psychology
             Brigham Young University

### EXPERIENCE

1983-        --Clinical Psychologist in private practice
1993-        --Consulting Psychologist to Chronic Pain Program (Back
             Education and Rehabilitation Program), Alaska Spine Institute
             Anchorage, Alaska
1987-1995    --Adjunct Instructor, University of Alaska, Anchorage
1984-1993    --Consulting Psychologist, Department of Corrections, State
             of Alaska
1987-90      --Clinical Coordinator, Pain Management Program,  Alaska
             Treatment Center, Anchorage, Alaska
1986-89      --Consulting Psychologist, Hope Cottages, Anchorage,
             Alaska
1983-86      --Consulting Psychologist, Human Affairs, Anchorage, Alaska
1979-83      --Licensed Clinical Psychologist, Central Peninsula Mental
             Health Center, Kenai, Alaska

Michael C. Rose, Ph.D.
Vitae
Page -2-

|         | --Consulting Psychologist, Kenai Peninsula Care Center (residential adolescent treatment facility). |
| 1980-84 | --Instructor of Psychology, Kenai Peninsula Community College, Soldotna, Alaska |
| 1979    | --Adjunct Assistant Professor of Psychology, Brigham Young University, Provo, Utah |
| 1978-79 | --Intern Clinical Psychologist, Timpanogos Community Mental Health Center, Provo, Utah |
| 1975-79 | --School Psychologist, Provo School District, Provo, Utah |
| 1977-78 | --Adjunct Instructor of Psychology, Brigham Young University, Provo, Utah. |
| 1976-77 | --Acting Coordinator School Psychology Program, Department of Educational Psychology, Brigham Young University, Provo, Utah. |

## PROFESSIONAL ACTIVITIES

Member, American Psychological Association
Member, American College of Forensic Psychology
Board of Directors, Alaska Specialized Education and Training Services (ASSETS), 1991-1993
Member, Governor's Council for the Handicapped and Gifted, State of Alaska (1983-86)
Who's Who in the West, 1983-84
Outstanding Young Men of America, 1985

## PUBLICATIONS, PRESENTATIONS, RESEARCH ACTIVITIES

Cundick, B.P. & Rose, M.C, Elementary Self-Rating Scale. In O.G. Johnson (Ed.), Tests and measurements in child development. Handbook II, Volume II. San Francisco, Jossey-Bass, 1976.

Rose, M.C. MMPI personality characteristics of adult males involved in domestic violence. Unpublished manuscript.

Rose, M.C. Protocol for agencies serving victims and perpetrators of adult sexual assault and domestic violence. Unpublished manuscript, Kenai, Alaska, 1983.

Rose, M.C. Self, peer, and teacher perceptions of child sociometric status. Unpublished thesis manuscript, Brigham Young University, 1975.

Rose, M.C & Crawford M.S. Executive stress management. Presentation to Alaska State Community Extension Service Conference, Anchorage, Alaska, March 1982.

Rose, M.C., Cundick, B.P., & Higbee, K. Verbal rehearsal and visual imagery: Mnemonic techniques for learning-disabled children. Journal of Learning Disabilities, 1983, 16, 6, 352-354.

Rose, M.C. & DeLaMare, M. A manual of mnemonic strategies for learning disabled children. Provo School District, Provo, Utah, 1979.

Michael C. Rose, Ph.D.
Vitae
Page - 3 -

Rose, M.C. & Turner, P.E.  A community education stress management program:  Effects on hand temperature.  Paper presented at American Association of Behavior Therapy, November, 1982.

Rose, M.C & Turner, P.E  Stress management for medical assistants.  Presentation to Alaska Association of Medical Assistants Conference, Soldotna, Alaska, May 1983.

Rose, M.C.  Stress Management: Presentation to ARCO employees, Prudhoe Bay-Kuparuk, May-June, 1984.

Rose, M.C.  The Cognitive-Behavioral Treatment of Chronic Pain Patients.  Paper presented at Clinical Strategies for Pain Management Conference, Anchorage, Alaska, October, 1988.

Rose, M.C.  The Role of Self-Regulation in Recovery From Chronic Pain.  Paper presented at Pain Management Conference. Elmendorf Air Force Base Hospital. Elmendorf, Alaska. April 20, 2001.

Rose, M.C.    Mental Health Issues in Recovery From Chronic Pain.  Behavioral Health Seminar.  Alaska Federal Health Care Partnership.  Alaska Native Medical Center. Anchorage, Alaska. January 18, 2002

## TRAINING, SEMINARS, WORKSHOPS

- Assessment of Adaptive Behavior of the Mentally Retarded, Utah State Board of Education, Salt Lake City, Utah, 1979.
- Cross-Cultural Psychotherapy Workshop, Denny DeGross, Kenai, Alaska, 1981.
- Workshop in Clinical Neuropsychology, University of Alaska-Anchorage, 1982.
- Training in the Treatment of Posttraumatic Stress Disorder, National Conference on Post-Viet Nam Stress Syndrome. Cincinnati, Ohio, 1982.
- Assessment and Treatment of Victims and Perpetrators of Domestic Violence and Sexual Assault, American Orthopsychiatric Association Annual Conference, San Francisco, California, April, 1982.
- Sexual Assault:  Rape and Child Molestation.  Assessment and Treatment of the Offender, A. Nicholas Groth, Ph.D. University of Washington, Seattle, Washington, March, 1983.
- Transcending Cultural Barriers to Communication and Therapy. International Psychology Conference, Vienna, Austria, June 6-10, 1985.
- Sexual Assault: The Psychology and Treatment of the Sexual Offender.  Robert Freeman-Longo, A. Nicholas Groth, Ph.D. Vancouver, British Columbia, February 1986.
- Increasing Human Effectiveness, Robert Moawad, Edge Learning Institute, Seattle, Washington & Anchorage, Alaska, May, 1986.
- Assessment and Treatment of Chronic Pain Syndrome, Charter North Hospital, Anchorage, Alaska, September, 1987.
- Intensive Training in Cognitive-Behavioral Assessment and Treatment of Chronic Pain Patients, Casa Colina Rehabilitation Hospital, Pomona, California, November 11-17, 1987.

Michael C. Rose, Ph.D.
Vitae
Page - 4 -

- Helping People Change: First Annual Conference on Advances in the Cognitive Therapies, San Francisco, California, April 22-25, 1988.
- Conference on Cognitive-Behavior Therapy, Philip Kendall, Ph.D., Alaska School Psychology Association, February, 1989.
- Office Management of Chronic Pain. University of Washington, Seattle, Washington, October, 1989.
- Intervention in Child Sexual Abuse: Offenders, Victims and Survivors. Suzanne M. Sgroi, Ph.D. and A. Nicholas Groth, Ph.D., Anchorage, Alaska. August 15-17, 1990.
- Rape, Incest and Molestation: Investigation, Assessment and Treatment. Suzanne M. Sgroi, Ph.D. and A. Nicholas Groth, Ph.D., Anchorage, Alaska. August 15-17, 1990.
- Clinical Applications of MMPI-2 Conference. Roger Greene, Ph.D. Anchorage, Alaska. 10/5-6, 1990.
- Developmental Psychotherapy. Michael Mahoney, Ph.D. 11/1/90
- Crisis Intervention with Victims of Crime and Disaster. Patricia Resick, Ph.D. and Randal Quevillion, Ph.D. 11/2/90
- Prevention of Pathologic Grief. Edward Callahan, Ph.D. 11/2/90
- Multidisciplinary Management of Pain-Related Work Disability. 11/4/90
- Association for Advancement of Behavior Therapy. San Francisco, California. November 1-4, 1990.
- Working With Sexual Offenders: Treatment Skills for Professionals. Janice Marques, Ph.D., William Pithers, Ph.D., & Robert Freeman-Longo, MRC. Anchorage, Alaska: November 19-23, 1991.
- Eighth Annual Symposium in Forensic Psychology. San Francisco, California: April 9-12, 1992.
- Applied Psychopharmacology for Mental Health Professionals Workshop by Neil M. Kirschner, Ph.D. Anchorage, Alaska: November 13, 1992.
- Risk Assessment in Forensic Psychology—Kirk Heilbrun, Ph.D.
- Diagnostic and Structured Interviewing in Forensic Practice—Richard Rogers, Ph.D. American Board of Forensic Psychologists, San Diego, California, January, 1995.
- Psychological Management of Chronic Pain. Martin Schaefer, Ph.D. Anchorage, Alaska, November, 1995.
- Direct Examination and Cross-Examination of Psychologists. Lynne Goldwin, J.D., Anchorage, Alaska, March, 1996.
- Listening to the Body: Understanding the Language of Stress Related Symptoms. John Madden, Ph.D., Stanford University. In Anchorage, Alaska, October, 1996.
- Dialectical Behavior Therapy of Borderline Personality Disorder. Kerry Koerner, Ph.D. University of Washington. In Anchorage, Alaska, February, 1997.
- 13th Annual Symposium in Forensic Psychology. American College of Forensic Psychology. Vancouver, British Columbia, Canada. April 16-20, 1997.

Michael C. Rose, Ph.D.
Vitae
Page - 5 -

- 14th Annual Symposium in Forensic Psychology.  American College of Forensic Psychology.  San Francisco, California.  April 30-May 3, 1998.
- Integrative Couple Therapy.  Alaska Summer Solstice Institute.  Anchorage, Alaska.  June 22-23, 1998.
- 15th Annual Symposium in Forensic Psychology.  American College of Forensic Psychology.  Santa Fe, New Mexico. May, 1999
- Ethics and Risk Management in Psychology.  Gerald Koocher, Ph.D. Anchorage, Alaska.  February 19, 2000.
- 16th Annual Symposium in Forensic Psychology.  American College of Forensic Psychology.  Newport Beach, California.  April 5-9, 2000.
- Intensive Workshop on Personal Injury Examinations:  The Application of Psychology to the Law of Torts; The Forensic Examination of Psychological Injury; The Convergence of Ethics, Law and Practice.  Stuart A. Greenberg, Ph.D., ABPP.  Anchorage, Alaska.  September 29-30, 2000
- Legal and Ethical Risks and Risk Management in Professional Psychological Practice.  Jeffrey N. Younggren, Ph.D.  Anchorage, Alaska.  February 17, 2001.
- Pain Management Conference.  Elmendorf Air Force Base Hospital.  Elmendorf, Alaska.  April 20, 2001.
- 18th Annual Symposium in Forensic Psychology.  American College of Forensic Psychology.  San Francisco, California. April 18-21, 2002
- Effective and Responsible Use of Psychological Tests in Employment Selection (Public Safety/Law Enforcement).  NCS Pearson & Kent State University.  Phoenix, Arizona.  2-2-03
- Legal and Ethical Risks and Risk Management in Professional Psychological, Sequence 1:  General Risk Management Strategies.  Anchorage, Alaska.  2-22-03
- 20th Annual Symposium in Forensic Psychology.  American College of Forensic Psychology.  San Francisco, California.  April 1-4, 2004.
- Therapists in Court:  Practical Risk Management.  Eric G. Mart, Ph.D., ABPP.  Anchorage, Alaska.  May 15, 2004
- 21st Annual Symposium in Forensic Psychology.  American College of Forensic Psychology.  Newport Beach, California.  April 14-17, 2005
- Assessing Juvenile's Competence to Stand Trial:  A Guid for Clinical Practice.  Thomas Grisso, Ph.D. & Gina Vincent, Ph.D., San Francisco, California.  August 25 & 26, 2005.
- 22nd Annual Symposium in Forensic Psychology.  American College of Forensic Psychology.  San Francisco, California.  March 16-19, 2006

Michael C. Rose, Ph.D.
Vitae
Page - 6 -

## REFERENCES

Wandal W. Winn, M.D.
8721 Bell Place
Anchorage, Alaska 99507
(907) 562-0794

Paul Turner, Ph.D.
P. O. Box 270
Kenai, Alaska 99611
(907) 283-7015

Shawn Hadley, M.D.
3300 Providence Drive #01
Anchorage, Alaska 99508
(907) 562-2600

Laura Jones, Ph.D.
1600 A Street  Suite 210
Anchorage, Alaska 99501
(907) 277-0607

# EXHIBIT "F"

Page 34

1   A.   No.

2   Q.   Did you do any drugs in that hotel room?

3   A.   No.

4   Q.   Are you familiar -- are you aware of any occasion

5 where your mother obtained crack cocaine in exchange for

6 your having sex with somebody?

7   A.   No.

8   Q.   When you were living with your uncle in

9 Washington, were you ever sexually assaulted by him?

10   A.   No.

11   Q.   Did you ever tell anybody you were?

12   A.   Yes.

13   Q.   Who did you tell you were sexually assaulted by

14 your uncle in Washington?

15   A.   My mother.

16   Q.   That was a lie?

17   A.   Yeah, to my mom.

18   Q.   Why did you lie to your mother about that?

19   A.   Because I didn't like my uncle.  He was strict.

20 He enforced rules that were stupid.  And it was all to keep

21 me under his foot.  And I wanted to come home and -- I

22 don't know why I lied.

23   Q.   Well, do you recall having an interview with a

24 psychologist, a Dr. Rose?

25   A.   Yeah.

Page 35

1    Q.    Do you remember telling Dr. Rose that your uncle

2 physically abused you in -- or sexually assaulted you,

3 rather, in Washington?

4    A.    My uncle never physically sexually assaulted me.

5    Q.    Did you tell that to Dr. Rose?

6    A.    Not that I recall.

7    Q.    Did you ever tell the psychologist Dr. Rose that

8 your uncle massaged you a table?

9    A.    Yeah.

10    Q.    Is your uncle a masseuse?

11    A.    No.

12    Q.    Why was he massaging you on a table?

13    A.    He offered to give me a back rub.

14    Q.    When you say he offered to give you a back rub,

15 did you tell Dr. Rose that his hands were close to your

16 vagina?

17    A.    Yes, I remember that.

18    Q.    Was that part of the back rub?

19    A.    He was massaging my leg.

20            MR. JONES:  I'm going to object, that calls

21 for speculation.

22 BY MR. KENNER:

23    Q.    Have you ever worked as a prostitute?

24    A.    No.

25    Q.    Have you ever had sex in exchange for drugs or